

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-28-2006

# Cham v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-4251

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Cham v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1168.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1168

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-4251

ABOU CHAM,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS
Agency No. A79-307-524
Immigration Judge: Hon. Donald V. Ferlise

Argued January 9, 2006

Before: BARRY and AMBRO, <u>Circuit Judges</u>, and
DEBEVOISE,[*] <u>District Judge</u>

(Opinion Filed: April 28, 2006)

Joseph C. Hohenstein, Esq. (ARGUED)
Orlow & Orlow

---

[*] The Honorable Dickinson R. Debevoise, Senior District
Judge, United States District Court for the District of New
Jersey, sitting by designation.

620 Chestnut Street, Suite 656
Philadelphia, PA   19106

Counsel for Petitioner


Jonathan Cohn, Esq. (ARGUED)
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530
        -AND-
John J. Andre, Esq. (ARGUED)
Donald E. Keener, Esq.
Douglas E. Ginsburg, Esq.
John D. Williams, Esq.
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, D.C.   20044

Counsel for Respondent

––––––––––––

OPINION OF THE COURT

––––––––––––

BARRY, Circuit Judge

"It is a hallmark of the American system of justice
that anyone who appears as a litigant in an
American courtroom is treated with dignity and
respect.  That expectation must be met regardless
of the citizenship of the parties or the nature of the
litigation.  In a country built on the dreams and
accomplishments of an immigrant population, a
particularly severe wound is inflicted on that
principle when an immigration matter is not

2

conducted in accord with the best of our tradition of courtesy and fairness."[1]

The case now before us exemplifies the "severe wound . . . inflicted" when not a modicum of courtesy, of respect, or of any pretense of fairness is extended to a petitioner and the case he so valiantly attempted to present. Yet once again, under the "bullying" nature of the immigration judge's questioning, a petitioner was ground to bits. That immigration judge's conduct has been condemned in prior opinions of this court. *See*, *e.g.*, *Sukwanputra v. Gonzales*, 434 F.3d 627, 637-38 (3d Cir. 2006) ("intemperate and bias-laden remarks" interjected by the immigration judge, "none of which had any basis in the facts introduced, or the arguments made, at the hearing"); *Fiadjoe v. Attorney General*, 411 F.3d 135, 143, 145-46, 154-55 (3d Cir. 2005) ("bullying" and "brow beating" by the immigration judge; "continuing hostility towards the obviously distraught [petitioner] and his abusive treatment of her throughout the hearing," reducing her "to an inability to respond"; and an oral decision, later "sanitized," which was "crude (and cruel))."[2]

On the day on which oral argument was heard in this case, a Deputy Assistant Attorney General appeared, at our request, to explain what, if any, procedures are followed when repeated conduct of this nature is seen. It is not coincidental, we think, that on that same day the Attorney General announced "a comprehensive review of the immigration courts." In a memorandum to immigration judges,[3] referenced during argument, the Attorney General made the following statement:

I have watched with concern the reports of

---

[1] *Iliev v. INS*, 127 F.3d 638, 643 (7th Cir. 1997).

[2] We are today filing yet another opinion in which we condemn the immigration judge's conduct. *See Shah v. Gonzales*, Nos. 04-3607 and 05-1122 (3d Cir. 2006).

[3] The memorandum, dated January 9, 2006, was later submitted to the Court pursuant to Fed. R. App. P. 28(j).

immigration judges who fail to treat aliens appearing before them with appropriate respect and consideration and who fail to produce the quality of work that I expect from employees of the Department of Justice. While I remain convinced that most immigration judges ably and professionally discharge their difficult duties, I believe there are some whose conduct can aptly be described as intemperate or even abusive and whose work must improve.

He concluded his statement by reminding immigration judges that "[t]o the aliens who stand before you, you are the face of American justice" and "insist[ing] that each be treated with courtesy and respect." We agree that most immigration judges "ably and professionally" discharge what surely are "difficult duties." We write because one of them, the Hon. Donald V. Ferlise, has seen fit on more than one occasion, including that now before us, not to do so.

## I.

We begin with a taste of the conduct which so troubles us, conduct which tainted the entire proceeding. At the very outset of the hearing, petitioner Abou Cham said, in English, that he was born in 1978.

> JUDGE TO MR. CHAM
> Q. All right. Remember what I told you, Mr. Cham? Mr. Cham, these instructions are not really earth shattering. They're not that complicated. We are going to stay totally in the Wolof language, now. All right?
> A. Okay.
> Q. Just, just answer in the Wolof language. It's rather simple. All right. What's your full date of birth, sir?
> A. 1979.
> Q. All right. Did you not just tell me 1978?

4

A. '78.

Q. Mr. Cham–

MS. DUSSEK TO MS. IBRAHIM.[4]

It's going to be a long day.

JUDGE TO MR. CHAM

Q. Mr. Cham, the question is a rather basic question. When were you born? You said in English, 1978. You said to interpreter in the Wolof language, 1979, or at least that was interpreted as 1979. I just brought that to your attention. Now, we're back to 1978. When were you born, Mr. Cham? Give me your date of birth?

A. I, I cannot count it in Wolof. That's the reason why I'm a little confused.

Q. I want to know the date you were born, sir.

A. 1978.

Q. What date? Give me a month.

A. September. September 28.

Q. And, please –

A. I'm sorry, sir. I'm sorry.

Q. Would you, please, remain in the Wolof language. I don't know why you're doing this. I'm giving you instructions to speak only in Wolof and you keep intermingling English and Wolof. So, what's your date of birth, now? Sir, the questions are going to get progressively more difficult. We're two minutes into the hearing and already you're having difficulty with a simple question. When were you born?

A. When it come to counting, Your Honor, I am, I'm not very, very good at it in Wolof. I am better at counting in English than I am in Wolof. I'm very sorry.

Q. I'm not asking you to count. I'm asking you to give me a month. Give me a month

---

[4] Ms. Dussek was government counsel and Ms. Ibrahim was Cham's counsel.

that you were born.

A.    Okay.  I would like to know, Your Honor, if I can say the month in English?

JUDGE TO [INTERPRETER]

Mr. Interpreter, in the Wolof language, are the months January, February, March – are there 12 months?

[INTERPRETER] TO JUDGE

Yes, there are, there are 12 months but they use the arabic [names for the] month . . .

JUDGE TO [INTERPRETER]

All right.  Well, you'll know that.  You'll know the months – don't you?

[INTERPRETER] TO JUDGE

Your Honor, personally, I know few of them.  I don't know all of them . . .  I use the French or the English . . .

JUDGE TO MR. CHAM

Q.    Okay.  What's the – give me your date in English, date of birth in English.

Q.    September 28, 1978.

(A.R. 91-93.)

And just moments later:

JUDGE TO MR. CHAM

Q.    Mr. Cham, do you have a problem following directions?

A.    I'm sorry, sir.  I'm sorry.

Q.    Well, I'm, I'm tired.  I'm sorry.  And I'm tired of hearing you say I'm sorry.  I don't want you speaking English.

A.    Okay.

Q.    Don't you understand the problem? Don't you understand this premise?

A.    Okay.

Q.    I don't want you speaking English.  I gave you the opportunity and you flubbed the opportunity.  You were tripping all over the words

6

in English.  Your English is not that good.  I thought it was better.  Now, instead of using your native language with the interpreter that I've provided at some cost to the Government, you want to impress me with your English.  Stay in that Wolof language.

> A.    Okay, sir.
> Q.    You're just delaying everything here.
> A.    I'm sorry, sir.  I'm sorry.  I'm very sorry.  Forgive me.

(A.R. 99-100.)

Shortly thereafter, Judge Ferlise saw another opening when the subject of Cham's age resurfaced.

MS. DUSSEK TO MR. CHAM
> Q.    Now, you stated that you were 14 when you left the Gambia.  Is that right?
> A.    Yes.
> Q.    But in, in, in 1994, if you were born in 1978, you would have been almost 16, wouldn't that, wouldn't that be true?
> A.    I know my age but I think I'm in the – not far from, not far in between.

JUDGE TO MR. CHAM
> Q.    Not far from what?
> A.    Not far from between 14 and 16 – 15.
> Q.    You were 16, sir. . . . You were born in '78.  You were 3 months less – shy of being 16 . . . . You told me you were 14 when [the coup] occurred.  I'm telling you you were three months short of being 16.  There's a big difference between 14 and almost 16.  So I want to know why you told me you were 14.
> A.    I apologize.  It's just so much going in my mind but that's a mistake of – on my part.

JUDGE TO MS. DUSSEK
> Proceed.

(A.R. 140-41.)

The belligerence continued:

JUDGE TO MR. CHAM
A.    No, sir, I'm – like I'm very sorry . . . .
Q.    Would you stop with the sorry.  Just give me an answer.

(A.R. 160.)

.   .   .

Q.    You know what I'm talking about, now give me an answer.

(*Id*. at 163.)

Q.    Look, I'm not going to play games with you.  You know what I'm talking about.  Now, you better come up with an answer pretty quickly or I'll find that you're non-responsive.
A.    I'm sorry.

(*Id*.)

Towards the end of the second day of the hearing, and immediately after excluding evidence Cham sought to present, Judge Ferlise went after Cham one last time.

JUDGE TO MR. CHAM
Q.    All right.  All right, Mr. Cham, I want you to take the witness stand.  Why are you laughing, Mr. Cham?  Is this funny?  Is this whole procedure funny to you?
A.    No.  It's not funny.
Q.    Then why, why are you laughing inappropriately?
A.    I'm sorry.
Q.    Well, fine but if, if there's a joke to be shared I'm more than happy to share the joke

8

with you.  What's so funny?

    A.    It's just because I'm thinking about sitting back here and being hollered at and I'm sorry about.

    Q.    Hollered at?  Stand up, Mr. Cham.

(A.R. 185.)

## II.

Petitioner Abou Cham, now twenty-seven years of age, is a citizen of The Gambia.  He claims to have entered the United States on or about February 2, 2001 in Chicago, using the Gambian passport of his cousin, Fotou Cham, who lives in the United Kingdom.  On April 10, 2001, Cham filed an application for asylum, withholding of removal, and for relief under the United Nations Convention Against Torture ("CAT") with the former Immigration and Naturalization Service ("INS"), now the Bureau of Immigration and Customs Enforcement ("BICE").  On June 4, 2004, the INS initiated removal proceedings against him by issuing a Notice to Appear.  Judge Ferlise held hearings on April 7, 2003 and June 23, 2003, denied relief, and ordered Cham removed to The Gambia.  Cham filed a timely appeal with the Board of Immigration Appeals ("BIA").  On October 6, 2004, the BIA dismissed the appeal.  A timely petition for review to this Court followed.

Cham based his application for relief on his relationship with his uncle, Dawda K. Jawara, who was president of The Gambia until he was ousted by a military coup on July 22, 1994.  Jawara and his family, including Cham, are members of the People's Progressive Party ("PPP"), a political party that has since been banned by The Gambia's new regime.  Because of their association with Jawara and the PPP, four of Cham's uncles have been attacked and/or arrested and jailed since the coup.  His uncle, Oshous Njie, who was head of the Gambian Central Bank in Jawara's government was imprisoned for two years.  Another uncle, Baba Njie, a doctor, was stabbed by members of the new regime.  Two other uncles were jailed when the coup occurred.

9

At the time of the coup, Cham was fifteen years old. After two days of violence following the coup, Cham escaped alone to neighboring Senegal to live with his aunt. He lived and attended high school in Senegal until 2001, but left Senegal for the United States when his aunt informed him that "there were people looking for [him] and in my mind, those people were nobody else but the people connected to the people in power in Gambia." (A.R. 118-19.) As noted above, Cham's cousin, Fotou Cham, helped him by getting him plane tickets to England and then to Chicago, and by allowing him to use his Gambian passport to make the journey. Cham fears that if he returns to The Gambia he will be arrested because he will be easily recognized by members of the current regime. Cham's mother still resides in the Gambia; his father is deceased.

Cham submitted an affidavit from Jawara, written in 1996, which confirmed Jawara's status as former president of The Gambia and his relationship to Cham. Additionally, Cham submitted a letter from Osman Salla, Jawara's former ambassador to the United States, which warned that "Cham's life could be in danger should he return to [T]he Gambia." (A.R. 236.)

Cham also documented the fact that seven members of Jawara's family have been granted asylum in the United States. Judge Ferlise admitted the documents, but declared that "we don't boot strap one case on the other and I don't see the relevance of that group exhibit." (A.R. 80.) According to Cham, the PPP party is still banned in The Gambia, and its members are still being arrested and harassed, with their property and travel documents taken away. "[T]here's no peace in that country." (A.R. 146.)

In an oral decision rendered immediately after the hearing concluded, Judge Ferlise denied Cham's applications for relief and ordered him deported to The Gambia. There is no question that Judge Ferlise intended his decision to be bulletproof, and so every "i" was dotted and "t" was crossed – and then some. First, finding that Cham failed to present any proof of when he entered the United States, Judge Ferlise found that Cham failed to

demonstrate that he filed his asylum application within one year of entry, as required by 8 U.S.C. § 1158(a)(2)(B). Second, he found that Cham's testimony was "totally incredible," and that "[t]here is no portion of the respondent's testimony that makes sense to this Court." (A.R. 62-63.) As the basis for this finding, he cited numerous supposed inconsistencies in Cham's testimony and his demeanor. Third, on the basis of Cham's "total incredibility," he found that Cham has "fabricated his entire case in chief," "has fabricated his testimony," and has filed a frivolous application for asylum. (A.R. 63.)

Fourth, assuming that Cham's testimony was credible, Judge Ferlise found that Cham "has not presented a scintilla of evidence that he has ever been persecuted," and has failed to "establish a well-founded fear of persecution [or] establish[] that it is more likely than not that he would be persecuted again if he is returned to The Gambia." (A.R. 64.) Finally, assuming that he was considering Cham for asylum and further assuming that Cham was credible and that he had in fact been persecuted in the past, Judge Ferlise concluded that Cham's application would still be denied because he could avoid future persecution by simply returning to Senegal where he lived for years without any problem.

On appeal, the BIA adopted and affirmed the denial of Cham's substantive claims "for the reasons stated" by Judge Ferlise. (A.R. 2.) However, the BIA reversed Judge Ferlise's finding that Cham filed a frivolous asylum application – the record did not disclose that the application was knowingly fabricated and Judge Ferlise failed to "provide a sufficient explanation" for why he came to that conclusion.[5] (A.R. 3.) The

---

[5] We cannot ignore the fact that Judge Ferlise typically finds asylum applications "frivolous," and the BIA typically reverses that finding. We take this opportunity to observe that a finding of frivolousness must not be made lightly, for it renders the alien "permanently ineligible for any benefits under the immigration laws." *See Muhanna v. Gonzales*, 399 F.3d 582, 588 (3d Cir. 2005) (quoting 8 U.S.C. § 1158(d)(6)). We also

11

BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction under section 242(a)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(a)(1). We will review the immigration judge's opinion to the extent it was adopted by the BIA. *See Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.2 (3d Cir. 2001).

### III.

We began with a reminder of the "dignity," "respect," "courtesy," and "fairness," that a litigant should expect to receive in an American courtroom. These words, quoted by us at the very outset of this opinion, are not merely advisory or aspirational. Indeed, although Cham has no constitutional right to asylum, he was entitled, as a matter of due process, to a full and fair hearing on his application.[6] *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003); *Abdulai*, 239 F.3d at 549. A full and fair hearing would have provided him with a "neutral and impartial arbiter[]" of the merits of his claim and "a reasonable opportunity to present evidence on [his] behalf." *Abdulrahman*, 330 F.3d at 596 (citing *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Sanchez-Cruz v. INS*, 255 F.3d 775, 779 (9th Cir. 2001)). Cham received neither.

___

observe that an adverse credibility determination does not automatically and sufficiently support a finding of frivolousness, for 8 C.F.R. § 208.20 requires more – "a finding of deliberate fabrication of a 'material element' of an application, plus an opportunity for the alien to account for inconsistencies."

[6] On appeal to the BIA, Cham raised substantive allegations which, if true, would constitute a violation of due process. *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 595 n.5 (3d Cir. 2003) ("While [petitioner's] appeal to the [BIA] did not frame the matter in due process terms in so many words, both his notice of appeal and his later brief to the [BIA] argued that the IJ impermissibly based her decision on her own speculative beliefs rather than on the evidence."). We review the issue of whether Cham was denied due process *de novo*. *Id*. at 595-96.

"'No person [may] be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.'" *Wang v. AG of the United States*, 423 F.3d 260, 269 (3d Cir. 2005) (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980)). It is crystal clear that Judge Ferlise presumed Cham's application to be without merit before even a shred of testimony had been presented, and treated Cham accordingly. Indeed, early in this opinion, when we used the phrase "ground to bits," we did not do so idly. From the very beginning of the two-day hearing in this matter until the very end, Judge Ferlise continually abused an increasingly distraught petitioner, rendering him unable to coherently respond to Judge Ferlise's questions. This, of course, enabled Judge Ferlise to then conclude that Cham's testimony was "totally incredible" because of inconsistencies and because his demeanor was that of "an individual not telling the truth."[6] (A.R. 63.)

Beyond the belligerence, there was wholesale nitpicking of Cham's testimony with an eye towards finding inconsistencies and contradictions that Judge Ferlise undoubtedly believed would nail the lid shut on Cham's case.[7] And nitpicking it was. For example, Cham was fifteen at the time of the coup and testified, nine years later, that the coup took place in June 1994 when in fact it took place in July 1994. While we are at a loss to understand the relevance, much less the materiality, of this one-month discrepancy, Judge Ferlise made much of this "obvious

---

[6] With reference to demeanor, Cham, Judge Ferlise observed, started stuttering when he and the government asked him questions, stuttering that became more and more pronounced as the questions became more and more difficult – Cham was "extremely nervous" when being questioned by them. (A.R. 63.) *Mirabile dictu*.

[7] In the past, we have been reluctant to speculate as to the state of mind of an immigration judge. *See Sukwanputra v. Gonzales*, 434 F.3d 627, 638 (3d Cir. 2006); *Wang v. AG of the United States*, 423 F.3d 260, 269 (3d Cir. 2005). We are not reluctant to do so here.

contradiction," convinced that the date of such a "traumatic event" would be "forever seared in [Cham's] memory." (A.R. 58.) Indeed, the fact that Cham made this one-month mistake about an event which occurred years earlier when he was little more than a boy so exercised Judge Ferlise that he found that it "has a negative impact on his credibility and the credibility of his case in chief."[8] *Id.*

Another example. Judge Ferlise began his opinion by pointing out that Cham originally testified that he was born in 1978. "Then he changed it to the year 1979, then he changed it back to the year 1978, and finally settled on being born September 28, 1978 . . . ." (A.R. 54.) It is, of course, immaterial to Cham's claim of persecution whether he was born in 1978 or 1979. Moreover, it is clear from the dialogue that took place between Cham, the interpreter, and Judge Ferlise that Cham was being required by Judge Ferlise to say the month of his birth in the Wolof language and was unable to do so. It is clear, as well, that the interpreter did not know all of the months in Wolof. When Cham was finally permitted to give the date of his birth in English, he answered accurately and without hesitation. And, of course, there was the exchange, quoted above, in which Judge Ferlise ignored the fact that Cham said he was fifteen and focused on the contradiction between fourteen and "going on [sixteen]" (A.R. 55.) Cham was "unable" to explain this contradiction, and Judge Ferlise concluded that "[w]henever the Court sees a respondent's testimony impeaching subsequent testimony during a hearing, the credibility of the respondent and the case in chief naturally suffers." *Id.*

We do not pause to consider the various other even more minor discrepancies Judge Ferlise spotted, none of which even came close to the "heart of the claim." *See Xie v. Ashcroft*, 359

---

[8] Another one-month discrepancy of an event four years earlier was deemed worthy of note. Cham's mother obtained his passport for him and sent it to him two months later. Wrong, said Judge Ferlise. It was *three* months later.

F.3d 239, 246 (3d Cir. 2004).[9]  Suffice it to say that what is readily apparent as to those "discrepancies" is Judge Ferlise's inability to concede that any discrepancy can *be* minor for fear, we suppose, that any such concession would undermine his bottom line credibility determination.  We suggest that, given this inability, the credibility he undermined was his own.

The belligerence of the questioning and the tension in the courtroom fairly leap off the pages of the record.  That belligerence and that tension may well have prejudiced both Cham's ability to present his claims and the appropriate resolution of those claims.  It certainly demonstrated the intensity with which Judge Ferlise sought, at all costs, to support his denial of relief to Cham with an adverse credibility determination.

Judge Ferlise also denied Cham a reasonable opportunity to present evidence on his own behalf.  During the April 7 hearing, Judge Ferlise reluctantly admitted into evidence documentation that seven of Cham's aunts, uncles and cousins had been granted asylum in the United States on grounds allegedly similar to those Cham asserted.  In the course of doing so, however, he informed Cham's counsel that "we don't boot strap one case on the other and I don't see the relevance of that group exhibit."  (A.R. 80.)  The hearing was continued to a later date before Cham's three witnesses – family members who had been granted asylum and who Judge Ferlise knew were in court intending to corroborate Cham's testimony about the political

---

[9] Although not directly pertinent to our due process analysis, we note that for all petitions filed after May 11, 2005, an adverse credibility determination may now be made by an immigration judge "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the application's claim."  REAL ID Act of 2005, Pub. L. No. 109-13, §§ 101(a)(3)(iii), 101(h)(2).  (May 11, 2005) (codified at 8 U.S.C. § 1158(b)(1)(B)(iii).  Because Cham's petition was filed on or about November 19, 2004, this provision does not apply to his case.

situation in The Gambia – could be reached.  When that date arrived, Judge Ferlise was advised that the witnesses could not be present due to work commitments, but that they would be present at a subsequent date.  Judge Ferlise informed Cham: "No, there's (sic) no more next times.  Today is your last hearing, sir."  (A.R. 180.)

An applicant "cannot rely solely on the persecution of [his] family members to qualify for asylum," *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003), or "bootstrap," as Judge Ferlise termed it, but surely such evidence can be *relevant* to an asylum applicant's claim, *see*, *e.g.*, *Khalaj v. Cole*, 46 F.3d 828, 833 (8th Cir. 1994) (stating that a grant of asylum to "family members who share a petitioner's political beliefs is material to the likelihood of the petitioner's own persecution" so long as the cases share similar circumstances).  This is particularly true where, as alleged here, there is a high degree of factual similarity between the applicant's claim and those of his family members, and where his claim of political persecution rests on that very familial relationship.  *See, e.g.*, *Bropleh v. Gonzales*, 428 F.3d 772, 777 (8th Cir. 2005).[10]

While Judge Ferlise did allow documentation of Cham's relatives' grants of asylum to be admitted into evidence, "if a document is admitted into evidence with the caveat that it will be given 'no weight,' that is tantamount to an exclusion of

_____

[10] Bropleh feared persecution if removed to his native Liberia because he opposed the current government, and because the government knew his brother had been granted asylum in the United States.  *Bropleh v. Gonzales*, 428 F.3d 772, 775 (8th Cir. 2005).  He argued that the immigration judge who denied his asylum application violated his due process rights because asylum was granted to his brother under nearly identical circumstances.  *Id*. at 777.  The Eighth Circuit disagreed, noting that the immigration judge admitted the brother's immigration files into evidence, and concluded that the circumstances of the case were not sufficiently similar.  *Id*. at 777.  The implication is that, had they been similar, the brother's grant of asylum would have been relevant to Bropleh's application.

evidence." *Liu v. Ashcroft*, 372 F.3d 529, 531 n.3 (3d Cir. 2004). Judge Ferlise failed to "see the relevance" of that evidence, and did not even mention it in his opinion denying relief. Due process demands that an immigration judge "actually consider the evidence and argument that a party presents." *Abdulai*, 239 F.3d at 549 (internal quotations omitted). *See also Chen v. Gonzales*, 417 F.3d 268, 272-73 (2d Cir. 2005) (following *Abdulai*, and surveying reversals of the BIA by other circuits for failure to properly consider relevant evidence). We do not find it irrelevant that such a large number of Cham's immediate family members were granted asylum, and wonder, because we cannot know, whether that testimony would or should have made a difference.

The government does not attempt to defend Judge Ferlise's conduct, but argues that, putting that conduct aside and assuming that Cham was credible, the petition should be denied because Cham does not merit relief. The issue here, however, "is not whether the evidence as it stands supports the result reached by the immigration judge and the BIA," but instead "is whether the original deportation hearing was conducted in a fair enough fashion for one to determine that the BIA's decision was based on reasonable, substantial, and probative evidence." *Podio v. INS*, 153 F.3d 506, 509 (7th Cir. 1998). In *Podio*, the Court of Appeals for the Seventh Circuit held that an asylum applicant's due process right to a fair hearing was violated by an immigration judge's conduct, conduct strikingly similar to Judge Ferlise's conduct. There, as here, the immigration judge continuously interrupted the petitioner's testimony, preventing important parts of his story from becoming part of the record. *Id*. at 509-10. There, as here, the immigration judge denied petitioner's relatives – who had been granted asylum under similar circumstances – the opportunity to testify and corroborate his claim, stating that "they've got nothing to do with this case."[11] *Id*. at 510-11. Finding that these actions "had the

_____

[11] While these grants of asylum were not dispositive, the Seventh Circuit said, they were relevant "in light of the fact that [the relatives] followed [Podio] to the United States from Ukraine and were both granted asylum." *Id*. at 510-11.

17

potential for affecting the outcome of [the] deportation proceedings," the Seventh Circuit remanded for a new hearing. *Id*. at 511 (internal quotations omitted).

It is far from clear that Cham would have qualified for asylum, withholding of removal or CAT relief had there not been belligerent questioning and a failure to consider relevant evidence. The standard for a due process violation, however, is not so high. It is only required "that the violation of a procedural protection . . . had the *potential* for affecting the outcome of [the] deportation proceedings." *Shahandeh-Pey v. INS*, 831 F.2d 1384, 1389 (7th Cir. 1987). Had Cham not been brow beaten, and had corroboration by his relatives been actually heard and considered, it is possible that material details surrounding his experience would have come to light, justifying relief from deportation. We, therefore, conclude that Cham "must be given a second, and a real, chance to 'create a record' in a deportation hearing that comports with the requirements of due process." *See Podio*, 153 F.3d at 511.[12]

## IV.

One final, and wholly predictable, word. We urge that, on remand, a different immigration judge be assigned to any further proceedings. *See Sukwanputra*, 434 F.3d at 638 ("[W]hile we recognize that the assignment of an immigration judge is within the province of the Attorney General, if on remand an [immigration judge's] services are needed, we believe the parties would be far better served by the assignment to those

---

[12] Perhaps, on remand, Cham, now out of the cauldron, will be able to show that he filed his asylum application within one year of entry, as required by 8 U.S.C. § 1158(a)(2)(B). However, we reject his arguments that the one-year period of limitations of 8 U.S.C. § 1158(a)(2) for filing an asylum application violates both the Supremacy Clause and the Due Process Clause of the United States Constitution, and that 8 U.S.C. § 1158(a)(3), which bars judicial review of § 1158(a)(2) determinations, violates the Due Process Clause. *See Sukwanputra*, 434 F.3d at 631-32.

proceedings of a different [immigration judge]." (quoting *Korytnyuk v. Ashcroft*, 396 F.3d 272, 287 n.20 (3d Cir. 2005)) (citations and internal quotation marks omitted)).

We will grant the petition for review, vacate the order of the BIA, and remand to the BIA for further proceedings consistent with this opinion. We, of course, take no position on whether, at the end of the day, petitioner should prevail.