

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-19-2006

# Peravic v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2228

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Peravic v. Atty Gen USA" (2006). *2006 Decisions.* Paper 732.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/732

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-2228

GASPER PERAVIC,
                               Petitioner

v.

ATTORNEY GENERAL OF
THE UNITED STATES,
                               Respondent


On Petition for Review of an Order of
the Board of Immigration Appeals
(A78-198-998)

_____

Submitted Under Third Circuit LAR 34.1(a)
March 28, 2006

Before: MCKEE and VAN ANTWERPEN, <u>Circuit</u> <u>Judges</u>,
and POLLAK,[*] <u>District</u> <u>Judge</u>.

(Filed:  July 19, 2006)
_____

OPINION OF THE COURT
_____

POLLAK, District Judge.

    Gasper Peravic petitions for review of a decision by the Board of Immigration

Appeals ("BIA") dismissing his appeal of an Immigration Judge's ("IJ") denial of his

_____

[*]Honorable Louis H. Pollak, Senior District Judge for the United States District
Court of the Eastern District of Pennsylvania, sitting by designation.

application for asylum, withholding of removal, and protection under the Convention

Against Torture ("CAT"). Because the conduct of the IJ violated the petitioner's due

process right to a fair hearing, we will grant the petition for review, vacate the order of

the BIA, and remand to the BIA for further proceedings.

## I. Background

As we write for parties who are versed in the facts, we provide only a summary

background. Peravic is a twenty-nine-year-old native and citizen of Serbia and

Montenegro who is ethnically Albanian. He entered the United States on or about August

14, 1999 using an Italian passport and seeking admission under the Visa Waiver Pilot

Program, which waives certain passport and/or visa requirements for some

nonimmigrants. 8 U.S.C. § 1187; 8 C.F.R. § 217. The documents Peravic used to gain

admission to the United States were fraudulent, however, so he was deemed removable

without a hearing. *See* 8 U.S.C. § 1187(b)(2). Peravic then requested asylum, and, in

May of 2001, his case was referred to an Immigration Judge ("IJ") for a hearing on his

asylum, withholding of removal, and CAT claims.

In his asylum application – dated February 20, 2003 – Peravic contended that he

was persecuted for both his Albanian ethnicity and his membership in the political

organization known as the Democratic League of Montenegro or LDMN. He stated that

his affiliation with LDMN caused him to be arrested and abused by Serbian police

officers. Peravic stated his belief that he would be arrested or killed if he were to return

2

to his native country.  In that same application, Peravic described various detentions, beatings, and other persecutory acts by government authorities.  Most significantly, Peravic claimed that he was held for two days in September of 1996 and beaten "for the whole time."  Administrative Record ("A.R.") at 70.  In the affidavit attached to his asylum application, Peravic described the beatings he endured during this period as "vicious" and involving hitting and kicking to the face, back, and legs.  A.R. at 107.  Peravic further attested that, after the beating, "my mother nursed me [at home] for the next couple of weeks because I was frightened to go to the hospital and receive uncertain treatment."  A.R. at 107-08.

In a decision dated January 26, 2004, the IJ determined that Peravic was not credible and, accordingly, denied his applications for asylum, withholding of removal, and CAT relief.  The IJ did not base this assessment on inconsistencies or omissions regarding events central to Peravic's asylum application.  Instead, the IJ made her credibility determination based on Peravic's demeanor and her belief that Peravic gave overly vague testimony.  A.R. at 4-14.

The BIA reversed the IJ's credibility finding because the IJ failed to provide material inconsistences and omissions to support it.  Nonetheless, the BIA determined that, even were Peravic's claims taken as credible, Peravic did not experience past persecution or torture.  Further, the BIA concluded that while the IJ was impatient and abrupt with Peravic during his testimony, the IJ's behavior did not violate Peravic's fundamental due process rights.  A.R. at 2-3.

3

We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1) and "will review the immigration judge's opinion to the extent it was adopted by the BIA." *Cham v. Att'y Gen.*, 445 F.3d 683, 690 (3d Cir. 2006).

## II. Analysis

Because the issue is decisive, we begin and end with Peravic's claim that the IJ violated his fundamental due process to a fair hearing. Peravic argues that his due process rights were violated because the IJ failed to give Peravic "'a reasonable opportunity to present evidence on [his] behalf.'" *Cham*, 445 F.3d at 691 (quoting *Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003)); *see also Wang v. Att'y Gen.*, 423 F.3d 260, 269 (3d Cir. 2005) ("No person [may] be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." (citation and internal quotation marks omitted)). Though Peravic has no constitutional right to asylum, "he was entitled, as a matter of due process, to a full and fair hearing on his application." *Cham*, 445 F.3d at 691.

The record before us reveals that the IJ presiding over Peravic's claims was impatient, abrupt, and belligerent during the deportation proceeding. The IJ conducted most of Peravic's examination herself, and, in so doing, constantly berated and interrupted Peravic as he attempted to give his testimony. For example, in response to Peravic's tendency to answer questions before the interpreter finished his interpretation

4

from English to Albanian,[1] the IJ declared:

> Sir, you're being extremely abusive, very flippant, and, certainly, this on the record does not look good. You are not going to like my decision in this case if you continue along this way. I guarantee it. And no court of appeal is going to be sympathetic to your case because you're being extremely evasive, flippant, fake, and avoiding the question. So keep it up because it's not going to be a peaceful, pleasant resolution for you.

A.R. at 78-79.[2] Far from suggesting, however, that Peravic was being "abusive,"

"evasive," "flippant," or "fake," the record shows that the petitioner was harried and

---

[1] Peravic and Peravic's counsel explained to the IJ that Peravic understood English relatively well but could not speak it well, and that he was most comfortable responding to questions in his native language, Albanian. A.R. at 76-77.

[2] Indeed, the IJ spent a great deal of time arguing about Peravic's English abilities. The following exchange is one further example of the tension spurred by the topic:

| | |
|---|---|
| Peravic: | I'm sorry, Your Honor, I didn't say that. |
| Judge: | (For the record) The respondent just – for the record, the respondent just corrected the interpreter's English translation after listening to [it] without a further translation. |
| Judge: | Now what is it, sir? Tell me in English. What is it that you need to say? Tell me in English, sir. |
| Judge: | (For the record) He understands, obviously, English he's just making believe after being here for four years. He's repeatedly answered the questions before there's been a translation in the Albanian language. |
| Judge: | So, what is it sir? Sir – |
| Peravic: | I'm incapable of speaking English. |
| Judge: | But you're capable of understanding everything and, and responding before there is a translation, is that right. |
| Peravic's Lawyer: | Your Honor, his, his best language is, is Albanian, but honestly I, I don't remember what the question was . . . . |

A.R. at 75-76.

5

confused by the IJ's aggressive questioning. In one exchange, the IJ asked Peravic "what happened in March of 1999?" A.R. at 58. Peravic responded, "They [the police] came to my house . . . . began checking and they were threatening and cursing, they had guns pointed at us as they were walking. Because I was involved with this democratic party movement, they were looking for information and propaganda that related to this party." A.R. at 58. The IJ then asked Peravic again "So, my question was what happened?" Apparently taking the IJ's reiteration of her initial question as a request for further elaboration, Peravic described some of the things the police found in the search of his home, but the IJ then retorted that she did not ask about "what was found" but, instead, "what happened?" A.R. at 58. Exchanges such as these – in which Peravic uncertainly responded to the IJ's confusing questioning – were common[3] at this hearing. The IJ's

--------

[3]Another illustrative example of the IJ's aggressive questioning:

| IJ: | Sir, what happened in March of '93? |
|---|---|
| Peravic: | I was in school. |
| IJ: | I asked you what happened in March of '93. |
| Peravic: | We began when there was six students in the class, the teacher began to teach us, she took us in front of – he took us in front of the class. He told me to continue reading. He was so offended in a way that I had read before but just to put us down they made us go in front of the class, I was very nervous. As I was reading I was shaking and my voice – |
| IJ: | You were a 16 year old who was shaking as he was reading? Is that what you are telling me? |
| Peravic: | The way they threatened us to do it, or to read. |
| IJ: | Who threatened you? What are you talking about? You're in school, they ask you to read something. |
| Peravic: | The teacher. He, actually, tried to attack me and hit me. |

(continued...)

6

frequently hostile examination of Peravic appears to have undermined Peravic's ability to respond helpfully to the IJ's questions and casts doubt on the IJ's role as neutral arbiter.

More damaging, however, was the IJ's interruption of Peravic's testimony, which prevented meaningful parts of Peravic's story from becoming part of the record. Specifically, the IJ's questioning inhibited Peravic's capacity to provide critical information regarding his claims that he was detained and severely beaten in September of 1996. The IJ began by asking Peravic what happened in September of 1996. A.R. at 70. Peravic responded that he was arrested, held for two days, and "beaten the whole time" because of his membership in the LDMN. A.R. at 70. At that point, his lawyer took over the examination to question Peravic about his involvement with the LDMN and then attempted to have Peravic give a detailed account of his mistreatment while detained. A.R. at 70-71. The IJ, however, interrupted before Peravic could respond, saying, "You were held for two days, you already said you were beaten and you were questioned. [To Peravic's Lawyer] What else is there, counsel? And then he gets released. [To Peravic] How did you get released?" A.R. at 71. The IJ then proceeded with a line of questioning about the circumstances of Peravic's release from detention, and, consequently, detailed testimony about the extent of the beatings and the resulting injuries never made it into the

---

[3](...continued)

IJ:       What – sir were you in a school with learning disabilities of some kind?

Peravic:   No.

A.R. at 65-66.

7

record.

Nor does it appear that the IJ gave any weight to the affidavit attached to Peravic's asylum application, which contains the only detailed description of the September 1996 detention. In that affidavit Peravic stated:

> At that police station I was held for two (2) days of intense interrogation and vicious beatings. I was interrogated about the membership and leadership of the LDMN, about secret meeting places and the location of certain persons that had warrants of arrest against them as enemies of the state. I denied knowledge of any specific persons and locations, but towards the second day I could no longer answer any questions from the brutality of the beatings. My face was swollen from being hit numerous times, specifically my eyes and mouth. . . . At home my mother nursed me for the next couple of weeks because I was frightened to go to the hospital and receive uncertain treatment.

A.R. at 107-108. The IJ refused to credit the statements within the affidavit because she concluded that "the incidences [sic] enumerated in the written statement seem to relate to someone else other than this respondent" and "[t]here was no reference, by this respondent, to the incidence [sic] in question and there was, absolutely, no degree of elaboration by this respondent that would be consistent with the written submission presented to this court." A.R. at 12-13. Consequently, we can only speculate as to whether the affidavit would have made a difference if Peravic had been given a reasonable opportunity to present his evidence at the hearing.

The government does not attempt to justify – and the BIA did not accept – the IJ's basis for her negative credibility determination. Instead, the government argues that the BIA had before it a sufficient record to conclude that "even if the respondent's account

8

were determined to be credible, the respondent did not satisfy his burden of proof [because] he did not describe experiences that rose to the level of past persecution or torture." A.R. at 2-3. Consequently, the question now before us is whether the IJ barred "important parts of [the petitioner's] story from becoming part of the record," with the result of preventing the BIA's decision from being based on "reasonable, substantial, and probative evidence." *Cham*, 445 F.3d at 693-94.

In *Cham*, the IJ badgered the petitioner until he was unable to respond coherently to the IJ's questions as well and also engaged in "wholesale nitpicking" by focusing on minor inconsistencies in the petitioner's testimony. *Id.* at 691-92. Another significant problem in *Cham* was the IJ's failure to give the asylum applicant a "reasonable opportunity to present evidence on his own behalf." *Id.* at 692. These difficulties, we concluded, prevented "important parts of [the petitioner's] story from becoming part of the record," which "had the potential for affecting the outcome of the deportation proceedings." *Id*. at 694. Therefore, we held that the BIA's decision could not have been based on "reasonable, substantial, and probative evidence," and the petitioner "'must be given a second, and a real chance to "create a record" in a deportation hearing that comports with the requirements of due process.'" *Id*. (quoting *Podio v. INS*, 153 F.3d 506, 511 (7th Cir. 1998)).

Much as in *Cham*, had the IJ allowed Peravic to testify comprehensively about the abuse he claims to have suffered, "it is possible that material details surrounding his

experience would have come to light, justifying relief from deportation." *Id.*[4] In

Peravic's case, there is not enough information for a neutral arbiter to make a reasoned

determination either way because the IJ curtailed testimony about the extent of Peravic's

injuries sustained during the September of 1996 beating, was unwilling seriously to

evaluate the claims made in Peravic's affidavit, and appeared to be generally predisposed

against the petitioner. Necessarily, then, we conclude that a second hearing on Peravic's

asylum, withholding of removal, and CAT claims is needed – a second hearing at which

the judge accords the petitioner due process and, indeed, respect. And, as we felt

compelled to do in *Cham*, we now urge that the Attorney General assign a different

immigration judge to any further proceedings involving Peravic. *See id.*; *Korytnyuk v.*

*Ashcroft*, 396 F.3d 272, 287 n.20 (3d Cir. 2005) ("[W]hile we recognize the assignment

of an [IJ] is within the province of the Attorney General, if on remand an IJ's services are

needed, we believe the parties would be far better served by the assignment to those

proceedings of a different IJ." (citation and internal quotation marks omitted)).

## III. Conclusion

---

[4] For example, while we have noted that persecution denotes "extreme conduct" and that "the concept of persecution does not encompass all treatment that our society regards as unfair, unjust or even unlawful or unconstitutional," *see Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir.1993), we have also approvingly cited the Seventh Circuit's approach recognizing that even a single beating can constitute persecution if it is sufficiently severe. *Voci v. Gonzales*, 409 F.3d 607, 615-616 (3d Cir. 2005) (citing *Asani v. INS*, 154 F.3d 719, 722-23 (7th Cir. 1998) and *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997)).

For the reasons stated, we will grant the petition for review, vacate the order of the BIA, and remand to the BIA for further proceedings consistent with this opinion.