**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-3146 & 16-1586
_____

EVER ULISES SERRANO-ALBERTO,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
                                        Respondent
_____

On Petition for Review of Orders of the
Board of Immigration Appeals
(BIA No. A206-801-902)
Immigration Judge: Honorable Mirlande Tadal
_____

Argued: October 25, 2016

Before: VANASKIE, KRAUSE, and NYGAARD, *Circuit Judges*

(Opinion Filed: June 12, 22017)

Zachary Nightingale, Esq. **[ARGUED]**
Alisa R. Whitfield, Esq.
Van Der Hout Brigagliano & Nightingale
180 Sutter Street
5th Floor
San Francisco, CA 94104

*Counsel for Petitioner*

Thomas W. Hussey, Esq.
Lindsay M. Murphy, Esq. **[ARGUED]**
Song E. Park, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent*

_____

OPINION OF THE COURT

_____

KRAUSE, *Circuit Judge*.

The Fifth Amendment protects the liberty of all persons within our borders, including aliens in immigration proceedings who are entitled to due process of law—that is, a meaningful opportunity to be heard—before being deported. In this case, we are called upon to clarify our case law and to demarcate the boundaries of the due process owed to aliens in removal hearings. Because we conclude that the Immigration

Judge here denied Petitioner this fundamental right by actively preventing him from making his case for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), we will grant the petition for review of the Board of Immigration Appeals' affirmance and will vacate and remand for rehearing, urging reassignment on remand to a different Immigration Judge.

## I. Factual and Procedural Background[1]

Petitioner Ever Ulises Serrano-Alberto, a widely acclaimed professional soccer player, fled to the United States from his native country of El Salvador to escape violence at the hands of the notorious Mara Salvatrucha gang, commonly known as MS13. Serrano-Alberto was born and raised in the town of Apopa outside of San Salvador, the capital city of El Salvador, a nation consumed by gang warfare in recent years. Between approximately 2000 and 2008, Serrano-Alberto enjoyed a high-profile career in the Salvadoran national

---

[1] We begin with this factual summary of the events precipitating Serrano-Alberto's case, the substance of which is principally derived from the evidence and allegations presented to the IJ before and during Serrano-Alberto's removal hearing, to provide context for our discussion of that hearing. It is, of course, within the exclusive province of the agency to make factual findings, *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009), and here—where we evaluate a petition for review alleging denial of due process and will grant the petition and remand for rehearing on that basis—the assigned IJ will determine the facts based on the new evidentiary record assembled before it. *See Johnson v. Ashcroft*, 286 F.3d 696, 702-03 (3d Cir. 2002); *Matter of Y-S-L-C-*, 26 I. & N. Dec. 688, 690-92 (BIA 2015).

3

soccer league, garnering significant attention as a result of his success.

Serrano-Alberto's fame, however, did little to insulate him from MS13 gang violence, and, indeed, appears to have made targets of both him and his family since at least 2007. At that point, suspected gang members shot his brother, Edwin, leaving him paralyzed. The following year, according to Serrano-Alberto, the MS13 gang began to extort him for cash under threat of death. Although he first acquiesced out of fear for his family members' lives, and made six payments that fall, in November of 2008 he rejected the gang's persistent demands and communicated that he would no longer comply. Two weeks later, three suspected gang members shot Serrano-Alberto, his nephew, and a neighbor outside of Serrano-Alberto's mother's house, killing the neighbor and leaving Serrano-Alberto and his nephew hospitalized and in serious condition.

The police came to speak with Serrano-Alberto once during his hospital stay. Given the frequent collusion between the police and gang members, Serrano-Alberto was hesitant but willing to provide information. The police, however, refused to take a report because Serrano-Alberto did not know the names of the people who shot him, and although the police said they would return to the hospital to talk with him further, they neither returned nor pursued an investigation. In 2009, fearing further gang reprisal, Serrano-Alberto twice attempted to flee the country but he was returned both times by Mexican authorities.

Between late 2009 and May 2012, Serrano-Alberto was imprisoned in El Salvador on extortion charges of which he was ultimately absolved. Even while he was imprisoned,

4

however, gang members continued to search for him, and they shot another one of his brothers when that brother refused to divulge Serrano-Alberto's whereabouts. Immediately following his release from prison in 2012, Serrano-Alberto was targeted in yet another shooting—once again in his mother's neighborhood—by unknown assailants on a motorcycle. He narrowly escaped harm by diving under a nearby car.

After that incident, Serrano-Alberto moved multiple times to evade detection by MS13, settling in October 2013 in La Gloria, San Salvador, where he lived and worked with an older brother. During this time, his mother called and warned that gang members were continuing to pursue him with the intention of killing him, and soon after, in 2014, Serrano-Alberto observed what he believed to be those gang members in his new neighborhood. At that point, Serrano-Alberto fled to the United States.

In July 2014, not long after crossing into Texas, Serrano-Alberto was apprehended and detained by Department of Homeland Security Border Patrol. In December 2014, Serrano-Alberto applied for asylum, withholding of removal, and protection under the CAT, contending he feared persecution by gangs based on his

5

membership in an unspecified particular social group (PSG).[2] The manner in which the presiding IJ conducted Serrano-Alberto's removal hearing, which is the subject of this appeal, is discussed in more detail below. In sum, the IJ was confrontational, dismissive, and hostile, interrupting and belittling Serrano-Alberto's testimony, time and again cutting off his answers to questions, and nitpicking immaterial inconsistencies in his account. The next day, she ordered his removal from the United States. Serrano-Alberto appealed to the BIA, which twice rejected his entreaties, first affirming the IJ and then summarily denying Serrano-Alberto's motion to reopen his case in a one-and-a-half page opinion.

Serrano-Alberto now petitions this Court for review of both orders of the BIA, asserting, *inter alia*, that the BIA misapplied the law in rejecting his due process challenge to the IJ's order of removal. For the reasons that follow, we agree.

## II. Jurisdiction and Standard of Review

Although our jurisdiction is limited to final orders of the BIA under 8 U.S.C. § 1252, where the BIA affirms the IJ for the reasons set forth in his or her opinion, we review the

---

[2] Whether a social group constitutes a PSG, and is thus cognizable under the Immigration and Nationality Act (INA), *see* 8 U.S.C. § 1101(a)(42)(A), is a continuously developing question of law and one that must be answered on a case-by-case basis, s*ee Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 594-609 (3d Cir. 2011). Here, Serrano-Alberto identified his putative PSGs as soccer players perceived as wealthy and "professional soccer player[s] actively resisting gang control." Appellant's Br. 36.

IJ's decision directly. *Huang v. Att'y Gen.*, 620 F.3d 372, 379 (3d Cir. 2010). We will affirm findings of fact supported by substantial evidence and are bound by those findings "unless a reasonable adjudicator would be compelled to arrive at a contrary conclusion," *Camara*, 580 F.3d at 201, while we exercise plenary review over legal determinations, including whether a petitioner's due process rights have been violated, *see Abdulrahman v. Ashcroft*, 330 F.3d 587, 595-96 (3d Cir. 2005). By contrast, we review the denial of a motion to reopen for abuse of discretion and will reverse only if the denial was "arbitrary, irrational, or contrary to law." *Abulashvili v. Att'y Gen.*, 663 F.3d 197, 202 (3d Cir. 2011).

## III.   Discussion

This appeal requires us to carefully examine the underlying administrative proceeding that gives rise to this appeal and to situate that proceeding in the landscape of our precedent governing due process in removal hearings. Below, we first address the legal standards governing due process claims and the grounds for relief from removal raised by Serrano-Alberto. Next, we review in detail Serrano-Alberto's removal hearing and the process that led to his denial of relief. And finally, we consider our due process cases to date and their implications for the removal proceedings in this case.

7

**A. Legal Standards Governing Serrano-Alberto's Due Process Claims and Underlying Claims for Relief**

Throughout all phases of deportation proceedings, petitioners must be afforded due process of law. *See Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001). The Fifth Amendment thus guarantees aliens who are seeking to forestall or terminate removal proceedings an "opportunity to be heard at a meaningful time and in a meaningful manner." *Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003) (en banc) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). This guarantee comprises three key protections: (1) "factfinding based on a record produced before the decisionmaker and disclosed to him or her"; (2) the opportunity to "make arguments on his or her own behalf"; and (3) "an individualized determination of his [or her] interests." *Id.* (internal quotation marks omitted). In other words, petitioners must receive "a full and fair hearing that allows them a reasonable opportunity to present evidence on their behalf," *Abdulrahman*, 330 F.3d at 596 (internal quotation marks omitted), and a decision on the merits of their claim by a "neutral and impartial arbiter," *Abulashvili*, 663 F.3d at 207.

A petitioner claiming a procedural due process violation because he was not afforded the opportunity to argue on his own behalf is required to show "(1) that he was prevented from reasonably presenting his case[,] and (2) that substantial prejudice resulted." *Fadiga v. Att'y Gen.*, 488 F.3d 142, 155 (3d Cir. 2007) (internal quotation marks omitted). The nature of this right is one that focuses on the fairness of the process itself, *see Cham v. Att'y Gen.*, 445

F.3d 683, 691, 693 (3d Cir. 2006), and the substantial prejudice standard "is not so high" as to require a petitioner to prove he "would have qualified for asylum, withholding of removal or CAT relief" but for the alleged violation, *id.* at 694. Rather, a petitioner establishes a due process claim by showing that the infraction has "the *potential* for affecting the outcome of [the] deportation proceedings." *Id.* (quoting *Shahandeh-Pey v. INS*, 831 F.2d 1384, 1389 (7th Cir. 1987)) (alteration in original).

Because the potential for affecting the outcome of any given deportation proceeding requires the court to consider the record in relation to the potential grounds asserted for relief, we briefly summarize the three grounds urged by Serrano-Alberto; asylum, withholding of removal, and eligibility for CAT protection, each of which carries different requirements.

A petitioner seeking asylum must establish a well-founded fear of future persecution in his home country "on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42)(A); *see id.* § 1158(b), by demonstrating a subjective fear that is objectively reasonable, *Guo v. Ashcroft*, 386 F.3d 556, 564-65 (3d Cir. 2004). While not sufficient on its own to establish eligibility for asylum, substantial evidence of past persecution "triggers a rebuttable presumption of a well-founded fear of future persecution, as long as that fear is related to the past persecution." *Singh v. Gonzales*, 406 F.3d 191, 195-96 (3d Cir. 2005).

Although asylum is ultimately granted at the Attorney General's discretion, withholding of removal, if established,

9

is mandatory. *Id.* at 196. An applicant must make the same showing as that required for asylum, but must meet a more stringent "clear probability" standard, "that is, that it is more likely than not that h[is] life or freedom would be threatened if returned to h[is] country" because of his membership in a statutorily protected class. *Kaita v. Att'y Gen.*, 522 F.3d 288, 296 (3d Cir. 2008) (internal quotation marks omitted).

To qualify for protection under the CAT, a petitioner is required to demonstrate that "it is more likely than not that he . . . would be tortured" if returned to his country of origin. *Id.* at 300. Unlike asylum and withholding of removal, the petitioner's protected status is irrelevant, but he must show that "severe pain or suffering" will likely be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* (quoting 8 C.F.R. § 208.18(a)(1)) (additional citation omitted).

Following an adverse ruling with respect to any of these three grounds for relief, an applicant may appeal to the BIA, which reviews an IJ's conclusions of law and discretionary exercise of authority de novo but accords deference to factual findings, reversing the latter only for clear error. *See Huang*, 620 F.3d at 381. Once removal proceedings have concluded, a petitioner may file a motion to reopen, which will be granted only in "compelling circumstances," *Shardar v. Att'y Gen.*, 503 F.3d 308, 313 (3d Cir. 2007), and will be denied if the BIA determines "(1) the alien has not established a prima facie case for the relief sought; (2) the alien has not introduced previously unavailable, material evidence; or (3) in the case of discretionary relief (such as asylum), the alien would not be

10

entitled to relief even if the motion was granted," *Huang*, 620 F.3d at 389 (internal quotation marks omitted). With these standards in mind, we turn to the process that was afforded Serrano-Alberto.

**B.** **Serrano-Alberto's Removal Proceedings Before the IJ and BIA**

Two patterns emerge from the record concerning Serrano-Alberto's removal proceedings, spanning from his initial credible fear interview and application paperwork submitted to the Immigration Court to the actual removal hearing and denial of relief by the IJ and the BIA. First, Serrano-Alberto consistently asserted facts in his submissions that on their face offered strong support for his claims for relief. Second, at the hearing itself, his attempts to convey those facts were undercut by the IJ's hostile and impatient attitude, repeated interruptions and castigations, constrictions on relevant responses, and inexplicable focus on irrelevant details.

We begin our review of this record with the written materials assembled before the hearing and available for the IJ's review. These included Serrano-Alberto's I-589 application for relief, a DHS worksheet detailing his credible fear interview, documentary evidence submitted by Serrano-Alberto, and additional agency records and a country report provided by the DHS. In his I-589 application, Serrano-Alberto sought asylum or withholding of removal based on his membership in an unspecified PSG, and he responded affirmatively when asked whether he, his family, or his close friends had ever experienced harm, mistreatment, or threats, explaining, "In 2008 they tried to kill me, they asked for money in exchange of my life and my family the gangs,

11

because I played futbol in the first division, . . . they I [sic] made a lot of money." AR 686.[3]  In answering whether he feared harm or mistreatment if returned to his home country, he stated, "[T]he gangs would kill me, because they keep trying to find me.  2 years ago they shot at me again 2 people on a motorcycle.  My little brother as well has gotten injured and was left on a wheel chair and my brother who is older they tried to kill days after."  AR 686.  Additionally, with respect to whether he had ever been "accused, charged, arrested . . . or imprisoned in any country other than the United States," he explained that he "was detained . . . and . . . investigated" in El Salvador, but eventually released and exonerated "because [he] did not have relation with the case."  AR 687.  Finally, Serrano-Alberto also expressed in his application a fear of "being subjected to torture" if returned to El Salvador because "the gang already tried to kill also my brother have been injured [sic] in my country the gang operate with a final of causing fear, death, torture, & extorture, kidnap at a . . . national level."  AR 687.

Serrano-Alberto's credible fear worksheet offered similar insight into the factual grounds he alleged in support of his claims.  The DHS agent who interviewed Serrano-Alberto after he was apprehended crossing the border found him to be fearful of persecution if returned to El Salvador, noting on the worksheet that Serrano-Alberto feared deportation "because the gangs will kill [him]"; that after Serrano-Alberto was shot six times in 2008—an incident reported in the news—"the police would not take [his] report,

---

[3] Throughout, we cite Serrano-Alberto's Appendix (App.) whenever possible and the Administrative Record (AR) as necessary.

because [he] did not know the names of the people who shot [him]" and never asked him to describe what he witnessed that day; that Serrano-Alberto was the target of a shooting three years later because, he believed, he had witnessed the murder of his mother's neighbor in 2008; and that Serrano-Alberto did not believe he could relocate within El Salvador because the gang would be able to find him. App. 172. Serrano-Alberto confirmed the accuracy of this account to the interviewing agent.

Also contained in the written record was Serrano-Alberto's documentary evidence, which included newspaper articles regarding both his professional soccer career and the 2008 shooting; affidavits attesting to his good character; records of his 2012 acquittal; and his brothers' and his own medical records corroborating their bullet wounds from the shootings. The documentary evidence also included materials submitted by the DHS, such as Serrano-Alberto's initial detainment records, and a U.S. Department of State country report on human rights practices in El Salvador.

While the written materials in the record provided significant support for granting Serrano-Alberto relief, Serrano-Alberto was far less successful in his efforts to communicate the basis for his claims at the removal hearing itself. That hearing took place in February 2015, before IJ

13

Mirlande Tadal in Elizabeth, New Jersey.[4] Serrano-Alberto, at that point, was proceeding pro se and participating remotely by videoconference from the detention facility where he was housed. In addition to the IJ and Serrano-Alberto, a Spanish interpreter and a DHS representative were present.

From the outset, the IJ took an argumentative tone and expressed exasperation. Her first exchange with Serrano-Alberto was a contentious one, precipitated by Serrano-

[4] The Government produced the audio recording of this hearing on the Court's request, although it urged that the recording not be considered because the BIA was not obligated to listen to it and Serrano-Alberto failed to request that it be included in the record before the BIA. *See generally* 8 C.F.R. § 1003.5(a) (requiring that the record from the Immigration Court be forwarded to the BIA on appeal and directing the expeditious transcription of all relevant proceedings); Executive Office of Immigration Review, Immigration Court Practice Manual at 68 (Apr. 11, 2017), https://www.justice.gov/sites/default/files/pages/attachments/2016/12/02/practice_manual.pdf ("If an Immigration Judge's decision is appealed to the [BIA], the hearing is transcribed in appropriate cases and a transcript is sent to both parties."). Although we note that, whether on its own initiative or upon request of counsel, the BIA's review of such recordings could more fully inform its evaluation of a due process claim and facilitate appellate review, we agree with the Government that where, as here, it is not apparent the audio recording was made part of the record before the BIA, we will not consider it part of the record on appeal. We therefore do not rely on the recording for purposes of this opinion.

Alberto's misunderstanding of a question she asked regarding his I-589 application. Specifically, after confirming a packet of documentary evidence she received prior to the hearing was indeed submitted by Serrano-Alberto, the IJ asked whether he wished to make any corrections to his application, and he responded by attempting to verify the packet included a letter he had submitted from one of his brothers. The IJ reacted by immediately admonishing him to "[P]lease answer my questions. I am having problems today. No one wants to answer my questions." App. 26.

Resuming her questioning, the IJ then asked where in El Salvador Serrano-Alberto resided when he fled the country and how long he had lived there. When Serrano-Alberto proved unable to answer with a single residence and fixed time period because of his frequent moves to avoid detection by the gang, the IJ quickly became frustrated, stating on the record: "Okay, let's start again, sir. Please listen to the question. If you did not understand it, ask. I will repeat it. Ask me to repeat the question." App. 31. The second time around, Serrano-Alberto again attempted to explain his moves and why he could not provide precise dates, testifying: "Well, as I said before, I didn't live there [in Residencial La Gloria] for too long because I had to change my place of residence. I had to go from one place to another." App. 31-32. The IJ then interrupted even before the interpreter had the opportunity to translate Serrano-Alberto's next answer into English: "No, no, excuse me. All right, I understood that part of Spanish. You refuse to answer my question. You may have lived in other places -- . . . provide me with the year, the month and year you began living there until, a month and year and then after that you'll be able to tell me after you left,

15

you left this place you went to live to [sic] another place. All right, sir?" App. 32.

The tenor of the hearing only deteriorated from there. In addition to maintaining her hostile tone, the IJ interrupted Serrano-Alberto's testimony on multiple occasions and directed him to provide only "yes or no" answers to her questions, effectively precluding Serrano-Alberto from making his case. App. 37-38, 48. For example, during Serrano-Alberto's testimony regarding the police response to the 2008 shooting, the IJ's interjections repeatedly prevented Serrano-Alberto from presenting evidence critical to the element of government acquiescence in Serrano-Alberto's claim for protection under the CAT. First, the IJ asked whether Serrano-Alberto was able to provide the police with the names of the shooters, as they had requested, and Serrano-Alberto replied, "To me, it was not so easy because it is very hard to give information to the police in my country." App. 37. Failing to recognize the significance of this assertion, the IJ instead simply repeated her question, asking, "Did you provide, did you provide, when the police made this inquiry, did you provide information to the police? Yes or no, sir." App. 37. When Serrano-Alberto responded, "I didn't do it because they said they were going to come back and they didn't," App. 37, the IJ retorted, "No, when they asked you the information that day, sir, they asked you if you knew the name, the nickname, of those who may have assaulted you or shot at you. Did you give the police information right there and then? It was a simple question. Yes or no? Yes or no," App. 37. And when Serrano-Alberto explained that he "did not know who the[] [shooters] were" and he "could not identify them directly," the IJ reprimanded: "Sir, please listen to me. Just answer the question. You have a habit of not

16

answering the question. All right, we're going to be here all afternoon if you don't answer the question. All right, did you know who these people were, sir, yes or no?" App. 37-38. Serrano-Alberto tried one more time, saying, "I just know that they were gang members." App. 38. Again the IJ interjected: "When the police asked you to identify them, were you able to identify them to the police, yes or no?" App. 38. Serrano-Alberto finally replied, "No." App. 38.

The IJ's interference with Serrano-Alberto's presentation of his case was further exacerbated by the IJ's surprising lack of familiarity with the record at the hearing. For example, she incorrectly believed Serrano-Alberto had been convicted of extortion in El Salvador, apparently having overlooked the evidence he submitted of his acquittal. Additionally, she was unaware of Serrano-Alberto's career as a professional soccer player, going so far as to chide him for identifying his occupation as "playing football" and rejoining, "Did you work, sir? Please answer my question. We'll get to everything, sir. Did you work in El Salvador?" App. 33.

In another instance, although the written record before the IJ disclosed that the reason Serrano-Alberto fled to the United States was that he believed gang members would find him in his last place of residence, La Gloria, the IJ repetitiously asked only whether he "ha[d] any problems in La Gloria." App. 48. Frustrated by his answers that: "I didn't have any problems there because I didn't spend a lot of time there," and, "Well, I always found a way not to spend too much time where I lived," App. 48, the IJ interposed, "I'll ask the question again for the third time. Did you experience any problems in La Gloria? Yes or no," App. 48. At that point, Serrano-Alberto replied, "Directly, no, I didn't have any

17

problems, but, yes, they were looking for me." App. 48. Even then, when Serrano-Alberto tried to explain that his family members in other parts of the country had been approached by gang members who were looking for him during the time he was living in La Gloria, the IJ remained tightly focused on the fact that he had no direct, face-to-face contact with gang members in that location, stating, "Let's focus on your situation, sir. You claim that gang members were looking for you. How did you . . . come to the conclusion that gang members were looking for you while you were in La Gloria?" App. 48. When Serrano-Alberto again described the warnings he had received from family members living elsewhere in El Salvador that the gangs were attempting to locate him, instead of inquiring further about these warnings, the IJ asked, "Did you have any direct contact with gang members in La Gloria, sir? Did you have face to face contact with them?" App. 49. Serrano-Alberto replied that, other than observing "suspicious things going on" such as an "unknown car driving around" his neighborhood, he had not had face-to-face contact with gang members. App. 49. The IJ then moved on.

At the same time the IJ curtailed Serrano-Alberto's ability to explain himself or finish his answers, she repeatedly steered Serrano-Alberto away from matters directly relevant to his eligibility for relief, focusing instead on inconsequential details and inconsistencies that were easily reconcilable with Serrano-Alberto's narrative. For example, when Serrano-Alberto explained that the reason he was shot in 2008 was that he had refused to make any additional payments to the gang—payments demanded "in exchange of not killing [him or his] family," App. 42—the IJ, instead of eliciting further testimony on this point, chastised Serrano-Alberto for

confusing the frequency and exact dates of his prior payments to the gang. Even though he was able to recall making approximately six payments "between September and November of 2008," App. 42, his inability to provide the exact date and amount of each payment prompted the IJ to retort: "[W]hen I ask you a question, sir, there is a reason why the question was asked. When you answer my question, I listen to you, sir, and . . . your answers are being recorded. All right. So, we are listening to you sir. I am listening. I'm paying attention to every word that you say, sir." App. 42-43.

In another example, Serrano-Alberto attempted to describe the corrupt affiliation between the police and the gangs, testifying in response to questioning by DHS counsel that if he had reached out to the police after being released from the hospital, the gang would have "go[ne] directly to my house and kill[ed] me," App. 52. The IJ, however, spontaneously changed the topic and began berating Serrano-Alberto for submitting, without more explanation, his brother's medical records, i.e., those records corroborating the brother's shooting by gang members in 2007. When Serrano-Alberto then attempted to explain the significance of the records, the IJ cut him off, stating dismissively: "It does not provide the cause of the injury, sir. . . . I'll move on." App. 53.

At another point, after Serrano-Alberto recounted the 2008 incident where he was shot and hospitalized—testimony that he corroborated with the submission of his own medical records—the IJ, instead of inquiring about the shooting, honed in on the exact length of Serrano-Alberto's inpatient, as opposed to outpatient, hospital treatment—a detail of no particular relevance to his claims. Although Serrano-Alberto first tried to explain, "I couldn't tell you how many days

because I was several days under anesthesia because of my wounds and the pain," the IJ continued aggressively, "So you were discharged from the hospital when? A week? Two weeks? A month? Three months? A year," App. 36, and Serrano-Alberto eventually acquiesced in providing an estimate of "[a]pproximately a month," App. 36—placing his release in January of 2009.

Later in the hearing, however, the IJ again took up the issue when she noticed that the medical records Serrano-Alberto submitted reflected a discharge date of December 7, 2008, with "reference to outpatient for follow-up." AR 655. Accusing Serrano-Alberto of intentionally misrepresenting the length of his inpatient treatment, the IJ charged: "You testified, sir, that you were admitted at the hospital for a month. You submitted a document, sir, according to this document you were admitted . . . . less than what, nine days? . . . . And after that you were an outpatient. Is this correct?" App. 55. Serrano-Alberto agreed, but attempted to explain his continued hospital care (presumably as an outpatient) because "[w]hat happened was they made me walk and my wounds bled." App. 55. Incredulous, the IJ rejoined: "That wasn't the, you didn't answer the question, sir. . . . So which is correct, your testimony that you were discharged in early January 2009 or your submission, the written document that you were discharged on December 7, 2008? One is correct and one is not correct. Which one is correct and which one is not correct? There's no gray area. Which one is correct?" App. 55. Serrano-Alberto replied, "With all due respect, I made a mistake. The document is correct." App. 55. The IJ promptly announced she was finished with her questioning and asked Serrano-Alberto whether he wished to add

20

anything else. Not surprisingly after this browbeating, he responded "[n]o." App. 55.

The day after the hearing, the IJ issued an oral decision denying Serrano-Alberto's application for relief and ordering his removal to El Salvador. Although Serrano-Alberto's testimony was presumptively credible as the IJ rendered no adverse findings to the contrary, *see* 8 U.S.C. § 1158(b)(1)(B)(iii); *Camara*, 580 F.3d at 201, she found "there is no objective evidence whatsoever that the gang members were targeting him due to his refusal to pay the rent," App. 18. Based on that finding and her observation that the shooters from 2008 and 2012 themselves "did not give him any indication as to why they were shooting at him," App. 18, the IJ concluded that Serrano-Alberto's fear of persecution was not objectively reasonable. The IJ also held, with respect to asylum and withholding of removal, that Serrano-Alberto did not meet his burden of establishing "that individuals perceived as wealthy who refuse to pay gang taxes" constitute a PSG eligible for protection under the INA, App. 17, or that there was a nexus between his membership in any PSG and his fear of persecution. As for CAT protection, the IJ determined Serrano-Alberto failed to show that the Salvadoran government would consent or acquiesce if a gang attacked him, finding—again, despite Serrano-Alberto's presumptively credible testimony—that the police "repeatedly attempted to investigate the 2008 shooting." App. 20.

After retaining counsel, Serrano-Alberto timely appealed to the BIA, contesting the IJ's rulings and arguing the IJ violated his right to due process. The BIA adopted and affirmed the IJ's decision, dismissing the appeal. In its opinion, the BIA assumed, without deciding, that Serrano-Alberto had established membership in a PSG and/or had

21

established an imputed anti-gang political opinion, but held that he failed to demonstrate the required nexus—that is, that any protected ground was a central reason for the harm he experienced.[5]   With respect to persecution, the BIA noted,

---

[5] In a number of recent cases, the BIA likewise has assumed a cognizable PSG or imputed political opinion and disposed of the appeal by finding no nexus.  *See, e.g.*, *Bol-Velasquez v. Att'y Gen.*, No. 15-3098 (3d Cir. filed Aug. 28, 2015) (ECF Agency Case Docketed); *Bell v. Att'y Gen.*, No. 14-4781 (3d Cir. filed Dec. 18, 2014) (same); *Santos v. Att'y Gen.*, No. 14-1050 (3d Cir. filed Jan. 8, 2014) (same); *Ulloa-Santos v. Att'y Gen.*, No. 12-2781 (3d Cir. filed June 25, 2012) (same); *Orellana-Garcia v. Att'y Gen.*, No. 12-2099 (3d Cir. filed Apr. 20, 2012) (same).  This practice, however, can have troubling consequences.   First, it places the analytical cart before the horse in cases like this one, where the very definition of the PSG is then at issue, for denying relief based on the absence of a nexus begs the question: nexus to what?  *See, e.g., Bol-Velasquez*, No. 15-3098.  Even the Attorney General has observed "it would be better practice for Immigration Judges and the Board to address at the outset whether the applicant has established persecution on account of membership in a [PSG], rather than assuming it as the Board did here.  Deciding that issue—and defining the [PSG] of which the applicant is a part—is fundamental to the analysis of which party bears the burden of proof and what the nature of that burden is."  *Matter of A-T-*, 24 I. & N. Dec. 617, 623 n.7 (U.S. Att'y Gen. 2008).  Second, even where the PSG definition is undisputed—so that the BIA would certainly have discretion to conclude that the efficiency of assuming a given PSG weighs in favor of resolution at the nexus stage—a reflexive practice of simply assuming a PSG

first, that it was unclear whether Serrano-Alberto was targeted in the 2008 and 2012 shootings, and second, that Serrano-Alberto lived in El Salvador unharmed between 2012 and 2014, undermining the potential relevance of any earlier

---

has been established and is cognizable does not account for the very real benefits on the other side of the scale. Just as the Supreme Court has observed in the qualified immunity context, adjudication at every step is generally "necessary to support the Constitution's 'elaboration from case to case' and to prevent constitutional stagnation" because "[t]he law might be deprived of this explanation were a court simply to skip ahead," *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009) (holding the two-step protocol announced in *Saucier v. Katz*, 533 U.S. 194 (2001) is no longer mandatory "but often beneficial"), so here, the BIA's practice of assuming PSG and resolving cases on nexus grounds often inhibits the proper and orderly development of the law in this area by leaving the contours of protected status undefined, precluding further appellate review under the *Chenery* doctrine, *see SEC v. Chenery Corp.*, 332 U.S. 194 (1947), and ultimately generating additional needless litigation because of the uncertainty in this area, *see Valdiviezo-Galdamez*, 663 F.3d at 594-609; *Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993); *Matter of M-E-V-G-,* 26 I. & N. Dec. 227, 230 (BIA 2014). This is a case in point, where the IJ articulated the relevant PSG as "individuals perceived as wealthy who refuse to pay gang taxes," App. 17, although other definitions were reasonable, and the BIA, despite being presented with alternative formulations, declined to rule on the question altogether. In sum, for both of the reasons stated, we strongly encourage IJs and the BIA to define the PSG in question and to adjudicate the existence and cognizability of that PSG.

events. Finally, the BIA summarily affirmed the IJ's decision on CAT protection and "disagree[d] with" Serrano-Alberto's contention that the IJ did not fully develop the record, asserting that the IJ had considered the entire record and had provided Serrano-Alberto with a reasonable opportunity to present testimony, documents, and arguments, and finding "no indication that the actions of the [IJ] amount[ed] to a violation of due process." App. 13.

The BIA also denied Serrano-Alberto's subsequent motion to reopen. That motion reiterated his due process allegations, and highlighted additional evidence and testimony that he contended he would have offered if given a fair opportunity. For example, Serrano-Alberto offered sworn statements in the accompanying affidavit that when the gang members called him to collect rent, they "said they knew who I was because I was a soccer player, and they could track my movements by looking in the paper or the radio, so they would easily know where I was going to be playing. . . . I was afraid, because I knew other soccer players had been killed,"—statements suggesting that Serrano-Alberto's position as a soccer player placed him prominently on the gangs' radar and thus supporting his claim of membership in a PSG. App. 70. With respect to the gang's asserted reason for targeting him, Serrano-Alberto explained that his "soccer organization was explicitly opposed to gangs," and that he "would talk to the young men in [his] neighborhood about how they could play soccer too, and then they wouldn't need to be involved in any bad activities." App. 69. And finally, relevant to his claim for protection under the CAT, Serrano-Alberto attested to having "problems with the police," explaining that they often harassed and searched him, that in 2009 they "were threatening [him]," and that sometimes they

would stop him and "push [him] up against the wall, or hit or kick [him]." App. 71. He described one incident where officers hit him in the chest, held his head up so they could take a picture of him, laughed and made fun of his soccer team, made sarcastic comments, and used vulgar language before releasing him. App. 71.

## C. Serrano-Alberto's Due Process Claim

Serrano-Alberto now argues to this Court, as he did before the BIA on direct appeal and in his motion to reopen, that the IJ's conduct of the removal hearing violated his right to procedural due process.[6]

While in the vast majority of cases, IJs diligently comport with their constitutional and statutory obligations, and while it is only on rare occasion that we have held an IJ's conduct crosses the line, the record here compels us to conclude this is one of those rare cases. Because we reach this conclusion against the backdrop of the three main cases to date in which we have distinguished between permissible

---

[6] Serrano-Alberto also argued on appeal that the new evidence he presented in support of his motion to reopen could not have been presented previously, that this evidence demonstrates he was prejudiced by the due process violations at his removal hearing, that his expert testimony submitted in support of reopening makes a prima facie showing of his eligibility for relief, that he can establish persecution based on political opinion or membership in a PSG, and that the BIA failed to address Serrano-Alberto's eligibility for CAT protection in its opinion denying his motion to reopen. For the reasons set forth below, we need not reach these claims. *See infra* n.9.

and impermissible IJ conduct under the Due Process Clause, we will review each of those cases before addressing Serrano-Alberto's claims for relief.

First, in *Wang v. Attorney General*, 423 F.3d 260 (3d Cir. 2005), we held the petitioner did not receive due process where the IJ employed a disparaging and sarcastic tone throughout the petitioner's removal hearing and expressed great disapproval of aspects of the petitioner's personal life that were irrelevant to his claims, *id.* at 263-65. Among other things, the IJ repeatedly badgered the petitioner for paying a smuggler to help him abscond from China to the United States and pointed out that the petitioner had hired an immigration attorney and wore a suit and tie to court, assuming for these reasons that the petitioner must have significant financial resources. *Id.* at 263-64. The IJ also berated him for failing to pay a penalty levied against his parents in China for his wife's illegal second child, despite no evidence in the record that the petitioner had sufficient funds to do so at his disposal, *id.* at 263, and inexplicably chastised the petitioner in a derisive tone on the extent of his commitment to his disabled daughter in China, stating, for example, "Have you ever had medical records about your darling first child Ming Wang brought to the United States of America? Yes or no. . . . Well why don't you have any medical records here to prove to me that you care enough about your daughter to have asked the doctor here about her welfare?" *Id.* at 264.

Based on such comments, we concluded that the IJ's conduct in that case evinced bias against the petitioner, *id.* at 269-71, that "many of the issues addressed by the IJ at length . . . were irrelevant to" the petitioner's claims for relief, *id.* at 269, and that "[w]hile the IJ explicitly deemed her broad

26

character judgments relevant to her decision, they were not," *id.* at 270. We therefore granted the petition for review, explaining that the IJ's opinion was grossly insufficient to support her adverse credibility finding and that her "conduct so tainted the proceedings below that we [could not] be confident that [the petitioner] was afforded the opportunity fully to develop the factual predicates of his claim." *Id.* at 271. We also expressed our "sore[] disappoint[ment] that the IJ . . . chose to attack [the petitioner's] moral character rather than conduct a fair and impartial inquiry into his asylum claims," and we described "[t]he tone, the tenor, the disparagement, and the sarcasm of the IJ" as "more appropriate to a court television show than a federal court proceeding." *Id.* at 269.

Similarly, one year later, in *Cham v. Attorney General*, 445 F.3d 683 (3d Cir. 2006), we held due process was violated by an IJ who "continually abused an increasingly distraught petitioner, . . . wholesale nitpick[ed] . . . with an eye towards finding inconsistencies and contradictions," and denied that petitioner the opportunity to present testimony from critical witnesses who were only available on dates after the hearing, *id.* at 691-93. The numerous belligerent statements by the IJ included: "I don't want you speaking English. I gave you the opportunity and you flubbed the opportunity. You were tripping all over the words in English. Your English is not that good . . . . You're just delaying everything here. . . . Would you stop with the sorry. Just give me an answer. . . . Now, you better come up with an answer pretty quickly or I'll find that you're non-responsive." *Id.* at 688. After reviewing the record, we concluded the IJ's hostility infected the hearing and vitiated his adverse

27

credibility determination, and we vacated and remanded for rehearing. *Id.* at 694.

Although the Government in *Cham* contended that, regardless of the IJ's conduct, the petitioner's application did not merit relief, we explained, "The issue here . . . 'is not whether the evidence as it stands supports the result reached by the immigration judge and the BIA,' but instead 'is whether the original deportation hearing was conducted in a fair enough fashion for one to determine that the BIA's decision was based on reasonable, substantial, and probative evidence.'" *Id.* at 693 (quoting *Podio v. INS*, 153 F.3d 506, 509 (7th Cir. 1998)). It was sufficient, we explained, that the IJ's conduct "had the *potential* for affecting the outcome" of the proceedings, *id.* at 694 (quoting *Shahandeh-Pey,* 831 F.2d at 1389), and we concluded the "brow beaten" petitioner, verbally abused and deprived of the opportunity to present testimony essential to his case, deserved "a second, and a real, chance to create a record in a deportation hearing that

28

comports with the requirements of due process," *id.* (internal quotation marks omitted).[7]

In contrast, in *Abdulrahman v. Ashcroft*, 330 F.3d 587 (3d Cir. 2003), although we acknowledged "the language

---

[7] In at least three additional cases, we determined the IJ's adverse credibility findings to be unsupported by substantial evidence, remanding for rehearing and urging the reassignment of a different IJ. *See Sukwanputra v. Gonzales*, 434 F.3d 627, 637-38 (3d Cir. 2006); *Shah v. Att'y Gen.*, 446 F.3d 429, 430, 437 (3d Cir. 2006); *Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 155, 163 (3d Cir. 2005). Although not decided on constitutional grounds, the due process implications in each case are obvious and noteworthy. *See Sukwanputra*, 434 F.3d at 638 ("[E]ven if the IJ was not actually biased—and we do not speculate here as to h[is] state of mind—the mere appearance of bias on h[is] part could still diminish the stature of the judicial process []he represents. As stated by the Supreme Court, 'justice must satisfy the appearance of justice.'" (quoting *Offutt v. United States*, 348 U.S. 11, 13 (1954)) (additional internal citation and quotations marks omitted)); *Shah*, 446 F.3d at 437 ("Although we don't expect an Immigration Judge to search for ways to sustain an alien's testimony, neither do we expect the judge to search for ways to undermine and belittle it." (quoting *Zhang v. Gonzales*, 406 F.3d 150, 158 (3d Cir. 2005) (McKee, J., concurring)); *Fiadjoe*, 411 F.3d at 155 ("The conduct of the IJ by itself would require a rejection of his credibility finding."); *see also Myrie v. Att'y Gen.*, 855 F.3d 509, 511, 518 (3d Cir. 2017) (remanding on alternative grounds but expressing due process concerns with the IJ's conduct and urging reassignment on remand).

used by the IJ during the hearing and in her opinion [did] reflect an annoyance and dissatisfaction with [the petitioner's] testimony that [was] far from commendable," we held that this palpable "lack of courtesy" did not, without more, violate his due process rights, *id.* at 597. Critical to our conclusion was our determination that the IJ "did not obstruct or denigrate [the petitioner's] . . . testimony" and "interjected only to allow [the petitioner] to clarify inconsistent responses or to give him the opportunity to respond in further detail." *Id.* Even though "her commentary was not confined to the evidence in the record and smacked of impermissible conjecture," *id.* at 598, we determined the IJ's findings and credibility determination were "supported by substantial evidence," and thus her conclusions were "reasonable," *id.* at 599.

What these cases teach us is that, where a petitioner claims to have been deprived of the opportunity to "make arguments on his or her own behalf," *Dia*, 353 F.3d at 239, there is a spectrum of troubling conduct that is fact-specific and must be evaluated on a case-by-case basis to determine if (1) the petitioner "was prevented from reasonably presenting his case[,] and (2) . . . substantial prejudice resulted," *Fadiga*, 488 F.3d at 155 (internal quotation marks omitted). At one end of the spectrum, the "lack of courtesy," "interject[ions]" to clarify and develop the record, and "annoyance and dissatisfaction with . . . testimony" in *Abdulrahman*, 330 F.3d at 597, were not sufficient to establish a due process claim. At the other end, the "contemptuous tone," focus on "issues irrelevant to" the petitioner's claims, and findings unsupported by the record in *Wang*, 423 F.3d at 270, and the "wholesale nitpicking," "continual[] abuse[]" and "belligerence," and "interrupt[ions] . . . preventing important

30

parts of [the petitioner's] story from becoming a part of the record," in *Cham*, 445 F.3d at 691, 694, were flagrant enough to violate due process. Where these component parts of an IJ's conduct are sufficiently egregious, at least in combination, a petitioner's procedural due process rights are violated.

In Serrano-Alberto's case, we conclude the IJ's conduct falls on the impermissible end of the spectrum. Indeed, the IJ's conduct here shares many of the attributes of the conduct we found unconstitutional in *Wang* and *Cham*, including a hostile and demeaning tone, a focus on issues irrelevant to the merits, brow beating, and continual interruptions. *See supra* Sec. III.B. And in contrast to *Abdulrahman* where the interruptions assisted the petitioner in answering questions and appropriately refocused the hearing, 330 F.3d at 596-98, the IJ's interruptions here repeatedly shut down productive questioning and focused instead on irrelevant details, *see supra* Sec. III.B.

Also in contrast to *Abdulrahman*, the IJ's most critical findings and conclusions were not "reasonable" and "supported by substantial evidence," 330 F.3d at 599, but rather were directly contradicted by the record and otherwise inexplicable. Serrano-Alberto had testified that he was shot in 2008 shortly after refusing to continue making rent payments to the gang (corroborated by medical records, AR 655, 663), that "when I was detained, the gang members found [my brother] to ask him about me . . . . [telling] him that if they couldn't find me, that they were going to kill him and so they shot him and almost took his life," App. 53 (testimony also corroborated by medical records, AR 614-15), that he was the sole target of another shooting in 2012— immediately after he was released from prison, and that "my

31

mother and my brother told me that [gang members] were asking for me [in 2013] . . . . and . . . they were going to find me because their intention was to kill me," App. 46. Yet, the IJ, without making any adverse credibility determination, found that "nothing in the record suggests that [Serrano-Alberto] was the intended victim of the 2008 shooting . . . . [and] [t]he 2012 attack is similar," App. 18, and, remarkably, rested her conclusion that Serrano-Alberto's fear of persecution was not objectively reasonable on her observation that the drive-by shooters in 2008 and 2012 did not stop to tell him the reason "why they were shooting at him," App. 18. Just as remarkably, the BIA summarily stated: "The Immigration Judge correctly noted that the respondent has not shown that gang members or any other individuals or groups have any interest in him, or that he was the intended target in 2008 or 2012." App. 12.

Likewise, despite Serrano-Alberto's testimony, "I couldn't [report the 2008 shooting] because the police is associated with the gang . . . . If I went and reported them, I knew that they will go directly to my house and kill me," App. 51-52, and his sworn statement in his credible fear interview that police officers give information to gangs, App. 170, the IJ found that "[t]his record . . . does not establish that the . . . government would exercise willful blindness with respect to any hypothetical torture respondent might experience," App. 20, and the BIA simply "agree[d] with the Immigration Judge's conclusion that the respondent did not meet his burden to establish eligibility for protection under the CAT," App. 13.

All told, although the IJ neither denied a request from Serrano-Alberto to submit evidence, as in *Cham*, 445 F.3d at 691-93, nor belittled him for his life choices, as in *Wang*, 423

32

F.3d 263-65, the pervasiveness and egregiousness of the other problematic conduct here—the IJ's interrupting and cabining Serrano-Alberto to "yes or no" answers during critical testimony, honing in on various and sundry irrelevant details, making findings contradicted by the record, and maintaining a condescending and belligerent tone throughout the hearing, *see supra* Sec. III.B—evinced bias and created an intolerable atmosphere of intimidation. Combined with the IJ's lack of familiarity with the written record and failure to develop the record,[8] the IJ's conduct deprived Serrano-Alberto of "a full and fair hearing [with] . . . a reasonable opportunity to present evidence on [his] behalf," *Abdulrahman*, 330 F.3d at 596

---

[8] To be clear, we do not hold today that due process imposes on an IJ an affirmative obligation to develop the record or to gain a particular level of familiarity with a petitioner's case before presiding over her hearing. Like the Second Circuit, which has recognized the relevance of failure to develop the record to determining whether substantial evidence supports an IJ's decision, *see Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir. 2002), we have held previously that failure to develop the record is a relevant consideration in such circumstances as evaluating whether an IJ's adverse credibility determination is supported by substantial evidence, *see Senathirajah v. I.N.S.*, 157 F.3d 210, 220 (3d Cir. 1998), or whether the IJ has given the petitioner a fair opportunity to provide corroborating documentation, *see Toure v. Att'y Gen.*, 443 F.3d 310, 325 (3d Cir. 2006). Although the Eighth and Ninth Circuits have suggested that an IJ may be constitutionally obligated to develop the record under the Due Process Clause, *see Al Khouri v. Ashcroft*, 362 F.3d 461, 465 (8th Cir. 2004); *Agyeman v. I.N.S.*, 296 F.3d 871, 877 (9th Cir. 2002), we have not so held and do not go so far today.

(internal quotation marks omitted), and most certainly had "the *potential* for affecting the outcome of [the] deportation proceedings," *Cham*, 445 F.3d at 694 (quoting *Shahandeh-Pey,* 831 F.2d at 1389). In short, as in *Cham* and *Wang*, the IJ's conduct here "so tainted the proceedings below that we cannot be confident that [Serrano-Alberto] was afforded the opportunity fully to develop the factual predicates of his claim," *Wang*, 423 F.3d at 271; *see Cham*, 445 F.3d at 694.

Strikingly, the Government, instead of engaging Serrano-Alberto's due process argument, dedicated a mere two pages of its brief to the issue. And while the Government acknowledged at oral argument that there were instances "where the Immigration Judge stop[ped] him short when he [was] beginning to answer a question," Oral Arg. 39:36-41, it attempted to explain those instances away as "something getting lost in translation or something not necessarily being understood the first time around," Oral Arg. 39:47-52, arguing that "the fact that she became frustrated or a little bit annoyed that she wasn't getting direct answers from the petitioner isn't reason in and of itself to send this case back as a result of a due process violation," Oral Arg. 40:14-27. That explanation falls flat given the nature, number, and effect of the IJ's interruptions. *See supra* Sec. III.B.

We are also unmoved by the Government's suggestion that any errors by the IJ were cured because Serrano-Alberto "had an opportunity to file a motion to reopen to submit all this additional evidence." Oral Arg. 40:35-39. That argument is precisely the one we rejected in *Cham*, where we explained "[t]he issue . . . 'is not whether the evidence as it stands supports the result reached by the immigration judge and the BIA,' but instead 'is whether the original deportation hearing was conducted in a fair enough fashion for one to

34

determine that the BIA's decision was based on reasonable, substantial, and probative evidence.'" 445 F.3d at 693 (quoting *Podio*, 153 F.3d at 509).[9]

In sum, we have no occasion to address the merits of Serrano-Alberto's application for asylum, withholding of removal, and CAT protection because we conclude Serrano-Alberto is entitled to present his case anew and will grant his petition for review. We also urge the BIA, upon its further remand, to reassign this matter to a new IJ. As the BIA itself has recognized, "Conduct by an Immigration Judge that can be perceived as bullying or hostile can have a chilling effect

---

[9] Indeed, if anything, Serrano-Alberto's motion to reopen before the BIA would appear to reinforce the conclusion that the IJ's interference in Serrano-Alberto's presentation of his case had "the *potential* for affecting the outcome of [the] deportation proceedings," *Cham*, 445 F.3d at 694 (quoting *Shahandeh-Pey,* 831 F.2d at 1389), in view of the proof it proffered in support of Serrano-Alberto's claims for relief, *see, e.g.*, App. 69-71. Given our disposition of Serrano-Alberto's due process claim, however, we need not reach the question whether this motion was denied in error. Instead, Serrano-Alberto's petition for review of that order will be denied as moot because the IJ assigned on remand from the BIA will have jurisdiction to consider "any and all matters which [he] deems appropriate in the exercise of his administrative discretion or which are brought to his attention in compliance with the appropriate regulations," *Johnson*, 286 F.3d at 701 (quoting *Matter of Patel*, 16 I. & N. Dec. 600, 601 (BIA 1978)), including the evidence incorporated into Serrano-Alberto's motion to reopen, *see Matter of Y-S-L-C*, 26 I. & N. Dec. at 691.

on a respondent's testimony and thereby limit his or her ability to fully develop the facts of the claim," *Matter of Y-S-L-C-*, 26 I. & N. Dec. at 690, and when this type of "belittling . . . and insensitive" conduct occurs, *id.* at 691, it is "appropriate to . . . remand . . . for a new hearing before a different Immigration Judge," *id.*  Such was the case in both *Wang* and *Cham*, where we urged reassignment in view of the due process violations we identified in those cases, *see Wang*, 423 F.3d at 271; *Cham*, 445 F.3d at 694; *see also Myrie*, 855 F.3d at 511, 518.  And such is undoubtedly the case here as well.

## IV.    Conclusion

For the foregoing reasons, we will grant Serrano-Alberto's petition for review of the BIA's order denying his applications for asylum, withholding of removal, and protection under CAT, vacate that order, and remand to the BIA for proceedings consistent with this opinion.  We will also deny as moot Serrano-Alberto's petition for review of the BIA's denial of his motion to reopen.