**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2095
_____

JAYEOLA SAMUEL AMOS,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

_____

On Petition for Review of a
Decision of the Board of Immigration Appeals
A097-998-310
Immigration Judge: Nicholas A. Martz
_____

Argued May 20, 2024

Before: RESTREPO, FREEMAN, and McKEE, *Circuit
Judges*

(Opinion filed: October 1, 2025)

A. Patrick DeSabato
Colleen E. Doherty [ARGUED]

Kevin A. Feeley
Mary E. Levy
Tessa L. Polsky
Temple University
Beasley School of Law
1719 N Broad Street
Philadelphia, PA 19122

Jessica Rickabaugh
Tucker Law Group
1801 Market Street
Ten Penn Center, Suite 2500
Philadelphia, PA 19103
        *Counsel for Petitioner*

Merrick B. Garland
Joannabelle Aquino
Robert P. Coleman, III
Sarah E. Witri [ARGUED]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

_____

OPINION OF THE COURT
_____


McKEE, *Circuit Judge*.

Jayeola Samuel Amos is a native and citizen of Nigeria. He seeks relief from the Board of Immigration Appeals' final order of removal denying him asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[1]

Amos argues that: (1) his due process right to a fair and full hearing was denied because an interpreter was not provided at his immigration hearing; (2) the BIA misapplied the legal standard for determining whether a conspiracy to commit passport fraud constitutes a particularly serious crime within the meaning of the Immigration and Nationality Act ("INA")[2]; (3) the BIA erroneously denied him CAT relief by failing to conduct a proper analysis of government acquiescence pursuant to *Myrie v. Attorney General*[3] and to engage in the *Abdulai v. Ashcroft*[4] corroboration inquiry;[5] and (4) the Immigration Judge failed to satisfy its obligation to

---

[1] Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.

[2] INA § 241(b)(3)(B)(ii) (codified at 8 U.S.C. § 1231(b)(3)(B)(ii)).

[3] *Myrie v. Att'y Gen.*, 855 F.3d 509, 516–17 (3d Cir. 2017).

[4] *Abdulai v. Ashcroft*, 239 F.3d 542, 551–55 (3d Cir. 2001), *superseded by statute on other grounds by*, REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Tit. 1, sec. 101 119 Stat. 305, 310, as recognized in *Saravia v. Att'y Gen.*, 905 F.3d 729, 736 (3d Cir. 2018).

[5] Amos raises corroboration as a standalone issue. Because this issue goes to his eligibility for CAT relief, we find it appropriate to analyze it alongside the *Myrie* claim.

inform him of his eligibility for waiver of inadmissibility under 8 U.S.C. § 1182(h).

For the reasons explained below, we will grant Amos's petition for review as to all claims except for his due process claim. Although we find that Amos's due process claim is not established on this record, we nevertheless agree that Immigration Judges must provide interpreter services when necessary to afford a meaningful immigration hearing. We also agree that the BIA misapplied the legal standard used to make a particularly serious crime determination. We agree with both parties that the BIA failed to conduct a proper *Myrie v. Attorney General* analysis when assessing Amos's CAT claim.[6] We further find that the BIA erred in declining to remand to the IJ Amos's claim that he is apparently eligible for relief under 8 U.S.C. § 1182(h).

We will vacate the BIA's decision and remand for further consideration consistent with this opinion. The BIA should stay Amos's removal pending its decision on remand.

I.   **Background**

Amos first came to the United States and gained lawful permanent resident status in 2005.[7] He met his long-term partner, Abosede Olutoye, in 2008. They have four children,

---

[6] The government concedes that "[t]he Court should remand the petition for review with respect to CAT protection," and suggests that we "stay Amos's removal pending a decision in this matter by the Board." Gov't Suppl. Br. 45-46.

[7] United States Citizenship and Immigration Services ("USCIS") twice denied his Form N-400 Application for Naturalization, first in 2008 and then in 2015. AR 20.

all of whom are United States citizens. Prior to the conviction that led to his removal proceedings, Amos worked as a licensed practical nurse.

Between May of 2013 and April of 2014, Amos and three others conspired to submit fraudulent United States passport applications to acquire passports for noncitizens. The scheme generated approximately $19,528.42 for Amos and his co-conspirators. He was arrested in 2016, subsequently pleaded guilty to conspiracy to commit passport fraud, and was sentenced to twenty-seven months imprisonment. Shortly after his sentence was imposed, Amos fled to Canada. He remained in Canada for five months before being arrested and returned to the United States.

In October 2020, while Amos was incarcerated in Pennsylvania, the Department of Homeland Security served him with a Notice to Appear for removal proceedings. He was charged with inadmissibility under INA § 212(a)(2)(A)(i)(I) for committing or conspiring to commit a crime involving moral turpitude. In the removal proceeding that followed, the IJ sustained the charge of inadmissibility. Two months later, Amos—through counsel—filed applications for asylum, withholding of removal, and cancellation of removal.

At an ensuing hearing before another IJ, Amos testified about incidents of past persecution and articulated a fear of future persecution and torture if removed to Nigeria. He explained that when he lived in Nigeria, he served as the union chairman for bank employees. Between 1997 and

5

2001, members of the OPC, a militia group in Nigeria,[8] targeted Amos for negotiating favorable compensation for bank employees. He testified that on one occasion, militia members who claimed to be acting on behalf of the Nigerian government kidnapped and beat him, put a gun to his head, cut his cheek with a knife, and left him on the side of the road, resulting in his hospitalization. He reported the incident to law enforcement, but the police were "unable to arrest anyone."[9]

On another occasion, Amos returned home to find his apartment burned to the ground. He discovered a note in his work office purportedly from the OPC militia group in which they claimed responsibility for destroying his home. Again, Amos filed a police report. Again, no one was arrested. Amos submitted affidavits from his brother, mother, and fellow union members to corroborate his testimony about these incidents. His mother's sworn statement explained that as recently as 2019, "strange men" went to her house, threatened her, and inquired about Amos's whereabouts.[10]

In addition to Amos's testimony, the IJ heard testimony from his long-term partner, Olutoye. The IJ denied

---

[8] Although the Record does not elucidate what the OPC militia group is, Amos refers to the group as both the "Oodua Progressive Congress," AR 14 (Amos Opening Br. to BIA), and the "Oodua People's Congress," AR 1235 (Amos Credible-Interview Form). He further maintained that the OPC "are militia hired by government officials who work for the banks." AR 522.

[9] AR 70.

[10] AR 527.

Amos's applications for asylum, withholding of removal, and cancellation of removal after finding that Amos's and Olutoye's testimonies lacked credibility. Although the IJ denied Amos relief on credibility grounds, the IJ also reached independent grounds to support its denial. It denied Amos's application for cancellation of removal as a matter of discretion after finding that the adverse factors in his case outweighed the hardships Amos claimed would result from his removal.[11] The IJ also concluded that Amos had committed a particularly serious crime, and therefore, was statutorily barred from asylum and withholding of removal. Finally, the IJ determined that Amos had not met his burden of establishing that he would be tortured if removed to Nigeria, and that the government would acquiesce to any such torture.

---

[11] In support of this claim for relief, Amos offered testimony regarding hardship his children would suffer were he deported. He presented testimony that, prior to his incarceration, he was actively engaged in his children's care. Olutoye also presented testimony to that effect. She was later impeached by the government with a prior immigration form in which she had asserted that Amos was not actively involved in his children's care. The IJ believed these inconsistencies undermined Amos's claim that his deportation would cause hardship to his children. The BIA affirmed that finding and also found that Amos would not have received a Waiver of Inadmissibility, a separate form of relief available under 8 U.S.C. § 1182(h)(1)(B). While Amos does not seek review of the order denying cancellation of removal, the issue of hardship is relevant to the BIA's rejection of his claim that he is eligible for waiver of removal under 8 U.S.C. § 1182(h)(1)(B). *See infra* in II(E) at 26.

On appeal, the BIA found that the absence of a language interpreter did not deny Amos due process to a full and fair hearing because it was not convinced that Amos's witness had a language barrier. After considering the elements of the general conspiracy statute, 18 U.S.C. § 371, the BIA further affirmed the IJ's finding that the facts and circumstances surrounding Amos's conspiracy to commit passport fraud constituted a particularly serious crime. It also declined to remand for the IJ to consider a waiver of inadmissibility under 8 U.S.C. § 1182(h)(1)(B) because it believed that the hardship requirement for such relief was "more stringent" than the standard for cancellation of removal and "because discretion would not have been exercised favorably in any event."[12] Finally, it held that Amos did not show that he suffered torture at the instigation or acquiescence of the government, and agreed with the IJ that Amos's fear of future torture was "entirely speculative."[13] The BIA affirmed the IJ's decision in its entirety.

This timely petition for review followed.

## II. Discussion[14]

---

[12] AR 8.

[13] AR 9.

[14] Even where, as here, a noncitizen has committed a type of crime set forth in 8 U.S.C. § 1252(a)(2)(C), we have jurisdiction to review final orders of removal under 8 U.S.C. §§ 1252(a)(1) and (a)(2)(D) to the extent the petition for review raises constitutional claims or questions of law. *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 224-25 (2020).

8

## A. The Government's Challenge to Jurisdiction.

The government insists that we lack jurisdiction to review the BIA's denial of Amos's applications for relief because Amos has been convicted of a crime that triggers a statutory provision limiting our review to only constitutional claims or questions of law. Yet, this petition raises legal questions that are subject to our review.[15] Amos claims he was denied due process by the IJ's failure to identify and address his sole witness' limited English language proficiency. He further claims the BIA committed legal error when it held that he was convicted of a particularly serious crime based on his conspiracy violation under 18 U.S.C. § 371 without also considering the elements of the object of the conspiracy—here, passport fraud under 18 U.S.C. § 1542.

---

We also have jurisdiction to review legal and factual challenges to orders denying relief under the Convention Against Torture. *Patel v. Garland*, 596 U.S. 328, 340 (2022). If "the BIA affirms an IJ's decision and adds analysis of its own, we review both the IJ's and the BIA's decisions" in tandem. *Martinez v. Att'y Gen.*, 693 F.3d 408, 411 (3d Cir. 2012) (citing *Dia v. Ashcroft*, 353 F.3d 228, 243 (3d Cir. 2003)). In which case, we will reference the BIA—or agency—decision when discussing the issues generally, and we will reference the IJ's opinion only "when necessary." *Quao Lin Dong v. Att'y Gen.*, 638 F.3d 223, 229 n.1 (3d Cir. 2011).

[15] *See* 8 U.S.C. § 1252(a)(2)(D); *Guerrero-Lasprilla*, 589 U.S. at 340.

These are clearly questions of law that we have jurisdiction to review.[16]

## B. Amos's Due Process Claim.

We start with Amos's constitutional claim that the IJ's failure to investigate and cure his sole witness' alleged language barrier violated due process. The IJ found that Amos's testimony and that of his witness, Olutoye, lacked credibility and denied Amos's applications for relief. Amos does not challenge the substance of the IJ's credibility determination. Rather, he argues that the IJ's failure to evaluate whether his witness needed an interpreter substantially prejudiced his ability to reasonably present his case and deprived him of a fair hearing. His claim is based on his assertion that Olutoye had limited English proficiency and thus required an interpreter.

"The Fifth Amendment protects the liberty of all persons within our borders, including [noncitizens] in immigration proceedings who are entitled to due process of law—that is, a meaningful opportunity to be heard—before being deported."[17] "Throughout all phases of deportation proceedings," due process requires "a full and fair hearing that allows [petitioners] a reasonable opportunity to present

---

[16] *Guerrero-Lasprilla*, 589 U.S. at 225 (holding that, when a noncitizen has committed certain types of crimes, the INA limits review of final orders of removal to constitutional claims and questions of law, including "the application of a legal standard to undisputed or established facts").
[17] *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 211 (3d Cir. 2017).

evidence on their behalf[.]"[18]  It entitles a petitioner to (1) factfinding based on record evidence produced before the IJ and disclosed to the petitioner; (2) the ability to make arguments on his or her own behalf; and (3) the right to "an individualized determination of [his/her] interests."[19]

To state a due process claim, a petitioner must show that s/he suffered substantial prejudice as a result of not being able to reasonably present her/his case.[20]  To demonstrate substantial prejudice, the petitioner need not prove s/he would have qualified for relief from removal "but for the alleged violation."[21]  Rather, s/he is only required to show that the violation of a procedural protection had the *potential* to affect the outcome of the proceeding.[22]  "[W]e must consider the record in relation to the potential grounds for asserted relief" to determine whether the alleged due process violation could have affected the outcome.[23]  Our review is plenary.[24]

**1.**

---

[18] *Id.* at 213 (internal quotations omitted).

[19] *Abdulai*, 239 F.3d at 549.

[20] *Freza v. Att'y Gen.*, 49 F.4th 293, 298 (3d Cir. 2022) (quoting *Serrano-Alberto*, 859 F.3d at 213).

[21] *Serrano-Alberto*, 859 F.3d at 213 (citing *Cham v. Att'y Gen.*, 445 F.3d 683, 694 (3d Cir. 2006)).

[22] *Id.* (quoting *Cham*, 445 F.3d at 694).

[23] *Freza*, 49 F.4th at 298-99 (quoting *Serrano-Alberto*, 859 F.3d at 213).

[24] *Serrano-Alberto*, 859 F.3d at 213.

"[L]anguage barriers can make effective communication impossible,"[25] and thus undermine the fairness of removal proceedings. Accordingly, when the record shows that an IJ cannot adequately understand testimony, there is a significant risk that an applicant for relief will not be able to fairly present her/his claims to the IJ. Moreover, difficulties in communication can cause an IJ to doubt the veracity of a witness and thus lead to an unfair adverse credibility determination that will often prejudice the outcome of the proceedings.[26]

As we explained in *B.C. v. Attorney General*:[27]

The stakes in removal proceedings—whether a noncitizen will be deported—could hardly be higher. But despite the high stakes, the outcomes of these proceedings sometimes turn on minutiae. Small inconsistencies in a noncitizen's testimony can doom even those cases that might otherwise warrant relief. To ensure testimony is not unfairly characterized as inconsistent, a noncitizen must be able to communicate effectively with the officials deciding his case. . . [O]ur Court has long recognized the

---

[25] *B.C. v. Att'y Gen.*, 12 F.4th 306, 308 (3d Cir. 2021).
[26] *See id.* at 315.
[27] *Id.* at 308.

importance of a competent interpreter to ensure the fairness of proceedings to individuals who do not speak English.

The need for effective communication obviously extends beyond the petitioner and includes her/his witnesses. Failure to provide an interpreter when it becomes apparent that an applicant or a witness is unable to communicate effectively undermines the fairness and reliability of the proceeding, and thus constitutes a denial of due process. Nevertheless, the record before us does not support Amos's claim that language difficulties prevented his witness from effectively communicating with the IJ.

To start, Amos's counsel represented to the IJ that Olutoye "will testify for about 30 minutes in the English language."[28] Such a representation, of course, will not absolve an IJ of its obligation to verify language proficiency throughout removal proceedings if it subsequently appears that a communications problem exists. However, no such problem appears on this record. The transcript shows that Olutoye was responsive to sophisticated questioning and provided competent answers. When asked to explain how to operate a nebulizer machine, for example, she provided a comprehensive description of its mechanics and purpose.[29]

Likewise, when the government pressed Olutoye on her statement that she would have to move to Nigeria if Amos was deported, she clarified the difference between *choosing*

---

[28] AR 508.
[29] AR 370.

to leave the United States and *needing* to leave given the challenges inherent in raising four children as a single mother.[30] And when questioned on a prior inconsistent statement she made about Amos's parenting, she ably rebutted the government's attempt to establish a discrepancy between her earlier statement and her testimony that day. She explained that she did not believe Amos was completely unhelpful with their children. Instead, she clarified that while he assists, his assistance is different than hers.[31]

Amos nevertheless argues that certain incidents suggest a language barrier. Specifically, he believes that forty-eight instances where "indiscernible" is written in Olutoye's hearing transcript, and moments where Olutoye spoke in fragments, offered contradictory answers, was cut off by the government, and asked the IJ to repeat a question, are all indicative of language barrier.[32] We are unpersuaded. The incongruous answers Amos points to are less contradictions than they are indications of Olutoye's intent to clarify the statements on which the government sought to impeach her.[33] Moreover, her answers were not unresponsive

---

[30] *See* AR 425-26.

[31] AR 443 ("He would assist. Not like me. Not like I do.").

[32] Amos Opening Br. 33.

[33] For example, the government asked Olutoye if it is true that she fears both the danger of remaining in the United States without Amos *more than* the danger of moving to Nigeria with Amos. Olutoye's "No" response can reasonably be interpreted as her acknowledging that the government misunderstood her point. Moments later, she clarified that she wants Amos to remain in the United States to help her raise their children and would feel as though she has no

14

to the government's questions. She effectively explained potential inconsistencies between her testimony and her answers on the immigration forms she had completed in the past. By contrast with *B.C. v. Attorney General*, where an applicant was asked "*How* did you get on the airplane?" and responded "Cameroon,"[34] Amos does not point to any such *non sequitur* answers in Olutoye's testimony.

Amos does correctly note many "indiscernible" indications throughout Olutoye's hearing transcript. The inclusion of "indiscernible" in a transcript means the court reporter was unable to decipher what Olutoye said, and thus did not try to transcribe parts of her testimony. We agree that an "unusually large amount of 'indiscernible' testimony" entries may well suggest a language barrier.[35] That is especially significant when "coupled with other readily apparent indicia of misunderstandings."[36] However, we find no such other readily apparent indicia here, and the omissions in the transcript did not adversely impact Amos's ability to present his case to the IJ.[37]

---

choice but to move to Nigeria if he was deported—given the strains inherent in raising four children on a single, limited income. AR 425.

[34] *See B.C.,* 12 F.4th at 317.

[35] *Id.* at 318.

[36] *Id.*

[37] *McLeod v. I.N.S.*, 802 F.2d 89, 94-95 (3d Cir. 1986) (finding the poor quality of the removal hearing transcripts reprehensible but concluding the faulty transcripts did not bear on the applicant's ability to state his claim for relief).

We nevertheless stress that it is critically important that IJs take steps to ensure that anyone who testifies at an immigration hearing is afforded an interpreter when circumstances suggest a communications issue that could undermine a petitioner's right to a full and fair hearing. Here, however, Amos has not shown that having an interpreter had "the potential for affecting the outcome of [the] deportation proceedings."[38] Significantly, his attorney's representation that Olutoye would be able to communicate in English, paired with the totality of her testimony, establish the absence of any language difficulties that would rise to the level of a due process violation.

### C. The BIA's Particularly Serious Crime Determination.

Amos further argues that the BIA erred in how it determined that his conviction was a particularly serious crime under the INA. The BIA has developed a two-part test to determine whether a crime of conviction is particularly serious.[39] Our review of the BIA's application of law to fact is plenary.[40]

---

[38] *Serrano-Alberto*, 859 F.3d at 213 (citing *Cham*, 445 F.3d at 694).
[39] *See In re N-A-M-*, 24 I. & N. Dec. 336, 342 (BIA 2007) (instructing that after determining that the elements of the crime can potentially bring it within the ambit of a particularly serious crime, all reliable information can be considered to determine if a crime is particularly serious).
[40] *Luziga v. Att'y Gen.*, 937 F.3d 244, 252 n.9 (3d Cir. 2019).

**1.**

The government argues that Amos did not exhaust this claim before the BIA.
"[I]f the petitioner makes some effort, however insufficient, that puts the agency on notice of a straightforward issue, the requirement is satisfied."[41]  And even if a petitioner fails to raise an issue before the BIA, the exhaustion requirement is excused if the BIA actually considered the issue on its own initiative.[42]

While the BIA is not required "to guess which issues have been presented and which have not, the petitioner is not required to state precisely the alleged error."[43]  That is especially true when, as here, the BIA considered the IJ's application of the two-part test on its own.  Because the BIA considered Amos's contention that his conspiracy conviction does not constitute a particularly serious crime under the INA, we may consider Amos's claim of error.

**2.**

Amos was convicted of conspiracy to commit passport fraud in violation of 18 U.S.C. § 371, by conspiring to violate 18 U.S.C. § 1542.[44]  He claims the BIA misapplied the legal

---

[41] *Id.* at 251 (internal citation omitted) (explaining that our exhaustion policy is a liberal one).
[42] *Nkomo v. Att'y Gen.*, 986 F.3d 268, 273 (3d Cir. 2021).
[43] *Id.* at 272 (internal quotation marks omitted).
[44] Plea Agreement, AR 1090 (listing the 18 U.S.C. § 371 charge as the "Offense of Conviction" and 18 U.S.C. § 1542 as providing the "Elements of the Offense[]").

standard used to make a particularly serious crime determination by failing to "consider the object of [his] conspiracy conviction as an element of his offense."[45] We find that the BIA erred at step one for failing to consider the elements of the substantive offense of passport fraud.

The INA bars granting asylum or withholding of removal to noncitizens who, "having been convicted by final judgment of a particularly serious crime, constitute a danger to the community of the United States."[46] Section 241(b)(3)(B) of the INA further provides that anyone who is convicted of an aggravated felony, and sentenced to at least five years imprisonment, is considered to have committed a particularly serious crime.[47] The particularly serious crime classification, however, is not limited to aggravated felonies.[48] When an offense is not an aggravated felony, the agency, "in its exercise of delegated adjudicatory authority . . . decides whether an offense is particularly serious," which determines whether the conviction precludes relief from removal.[49]

---

[45] Amos Opening Br. 38.
[46] *See* INA § 208(b)(2)(A)(ii) (codified at 8 U.S.C. § 1158(b)(2)(A)(ii) and governing applications for asylum); INA § 241(b)(3)(B)(ii) (codified at 8 U.S.C. § 1231(b)(3)(B)(ii) and governing applications for withholding of removal).
[47] 8 U.S.C. § 1231(b)(3)(B) (flush language).
[48] *In re N-A-M-*, 24 I. & N. Dec. at 337 ("We hold that a particularly serious crime need not be an aggravated felony.").
[49] *Luziga*, 937 F.3d at 252 (citing 8 U.S.C § 1231(b)(3)(B)).

The BIA has developed methods for making that determination—culminating into what became the two-part test established by *In re N-A-M-*.[50] In *Matter of Frentescu*, the BIA created a factors test to determine if a conviction was particularly serious within the meaning of the INA.[51] It concluded that such determinations have to be made "on a case-by-case basis."[52] Four years later, in *Matter of Carballe*,[53] the BIA refined the particularly serious crime framework. There, the BIA reasoned that a crime is particularly serious if the "nature of the crime is one which indicates that the [noncitizen] poses a danger to the community."[54] The BIA stressed that "[t]he focus here is on the crime that was committed."[55]

In *In re N-A-M-*, the BIA incorporated the *Frentescu* factors into what is today the two-part test for making a particularly serious crime determination. At step one, the agency examines the elements of the crime of conviction to determine whether they "potentially bring the offense within

---

[50] *See generally* 24 I. & N. Dec. 336 (BIA 2007).

[51] *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (BIA 1982) ("[W]e look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the [applicant for relief] will be a danger to the community.").

[52] *Id.*

[53] *Matter of Carballe*, 19 I. & N. Dec. 357 (BIA 1986).

[54] *Id.* at 360.

[55] *Id.*

the ambit of a particularly serious crime."[56]  Looking to the correct statute at this step is critical because, if the elements do not potentially bring the offense within a category of a particularly serious crime, "the individual facts and circumstances of the offense are of no consequence, and the [noncitizen] would not be barred from a grant of withholding of removal."[57]  At step two, the agency can consider "all reliable information" to decide whether a person's conduct in committing the offense rose to the level of a particularly serious crime.[58]  "Reliable information" may include "the actual circumstances of the crime, well beyond what was disclosed by the elements."[59]

When a conspiracy conviction is based on a substantive offense, the agency must consider the elements of that offense at step one of its inquiry.  Here, the agency should have started its analysis with the elements delineated in section 1542, in addition to those in the general conspiracy statute at section 371.  Section 371 is incredibly broad and sweeps within its wide reach any illegal agreement to engage in conduct that constitutes an offense against the United States.  Yet not all conspiracies are created equal.  A conspiracy to steal a book of stamps from a post office

---

[56] *In re N-A-M-*, 24 I. & N. Dec. at 342; *see also id.* at 343 ("We find that the respondent's offense is a particularly serious crime based solely on its elements, i.e., that the offense by its 'nature' is a particularly serious one.").
[57] *Luziga*, 937 F.3d at 253 (citing *In re N-A-M-*, 24 I. & N. Dec. at 342).
[58] *In re N-A-M-*, 24 I. & N. Dec. at 342.
[59] *Id.* (citing *Matter of L-S-*, 22 I. & N. Dec. 645, 654-56 (BIA 1999)).

counter is not the same as a conspiracy to kill a postal worker. The seriousness of a conviction is not established merely because the offender agreed (i.e. "conspired") to do something that was illegal or to do something that was legal by illegal means. Accordingly, the inquiry into whether a conspiracy conviction constitutes a particularly serious offense under the INA cannot be resolved solely by focusing on the crime of conspiracy as set forth in 18 U.S.C. § 371.

It also must consider the elements of the underlying substantive offense. But when it does, it must account for the "significant difference between agreeing to [commit a substantive offense] and . . . carrying it out."[60] After all, a conviction for a conspiracy to commit a substantive offense does not require proof of all of the elements of the substantive offense.[61] It does not even require proof that the defendant committed any overt acts in furtherance of the substantive offense.[62]

The agency only proceeds to step two if the elements of the conspiracy, considered together with elements of the offense that was the object of the conspiracy, potentially constitute a particularly serious crime. Then, at step two, the agency can consider the noncitizen's specific conduct when committing the offense. Here, the BIA's failure to consider the elements of conspiracy to commit passport fraud under 18 U.S.C. § 371 alongside the elements of 18 U.S.C. § 1542 requires remand. On remand, the BIA must first determine whether the elements of both statutes potentially rise to the

---

[60] *Annor v. Garland*, 95 F.4th 820, 828 (4th Cir. 2024).
[61] *Id.*
[62] *Id.*

21

level of a particularly serious crime. "Only then may it proceed to consider the facts and circumstances" of Amos's offense.[63] Otherwise, the inquiry ends at step one. And at step one the BIA may not consider "a hybrid of the elements and facts" of Amos's conviction."[64]

### D. The BIA's Denial of Relief under the Convention Against Torture.

Amos further claims that the BIA erred in affirming the denial of CAT relief by misapplying our *Myrie* framework[65] and failing to conduct an appropriate *Abdulai* inquiry.[66] We agree. Moreover, (to its credit) the government concedes that "[t]he Court should remand the petition for review with respect to CAT protection."[67]

### 1.

CAT relief is appropriate when an applicant establishes "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."[68] We previously explained:

> For an act to constitute torture under [CAT] and the implementing regulations, it must be: (1) an act causing severe

---

[63] *See Luziga*, 937 F.3d at 254.

[64] *Id*.

[65] *Myrie v. Att'y Gen.*, 855 F.3d 509 (3d Cir. 2017).

[66] *Abdulai v. Ashcroft*, 239 F.3d 542 (3d Cir. 2001).

[67] Gov't Suppl. Br. 45.

[68] *Myrie*, 855 F.3d at 515 (citing 8 C.F.R. § 208.16(c)(2)).

physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.[69]

To determine whether an applicant has met his burden in proving that he is more likely than not to be tortured if removed, the agency must conduct a two-part inquiry. First, it must determine "what is likely to happen to the petitioner if removed."[70] Second, it asks whether "what is likely to happen amount[s] to the legal definition of torture[.]"[71] To determine whether an applicant has met his burden of establishing government acquiescence to the alleged torture, the agency conducts a separate two-part analysis. First, it "makes a factual finding or findings as to how public officials will likely act in response to the harm the petitioner fears.[72] Second, it considers whether "the likely response from public officials qualifies as acquiescence under the governing regulations."[73] When making that assessment, it considers whether the public official was aware of the torture and

---

[69] *Auguste v. Ridge*, 395 F.3d 123, 151 (3d Cir. 2005) (citing *Matter of J-E-*, 23 I. & N. Dec. 291, 297 (BIA 2002)).
[70] *Myrie*, 855 F.3d at 516.
[71] *Id.* (quoting *Kaplun v. Att'y Gen.*, 602 F.3d 260, 271 (3d Cir. 2010)).
[72] *Id.*
[73] *Id.*

23

breached its legal responsibility to intervene and prevent the torture.[74] Our review of whether the BIA misapplied the legal standard we enunciated in *Myrie* is plenary.[75]

Here, the BIA uncritically adopted the IJ's holding that Amos did not suffer torture and provided insufficient evidence to support finding government involvement or acquiescence. It reasoned that Amos "did not show that he suffered 'torture' in the past where he was kidnapped and assaulted by members of the OPC militia."[76] But it did not consider all factual evidence before it to determine what would happen if Amos were to return to Nigeria. The BIA ignored an affidavit from Amos's mother in which she stated that men "searched and scattered" her house and inquired about Amos's whereabouts in 2019.[77] Likewise, it ignored Amos's brother's affidavit in which he attested that, on two occasions, his mother was threatened and accosted by men searching for Amos. Further, the BIA noted the incidents Amos describe occurred two decades ago and reasoned that it was "entirely speculative [that] anyone would now seek to torture the respondent."[78] Of course, any future prediction is, by definition, speculative. Denying protection merely because such predictions lack certainty would undermine the relief CAT was intended to bestow.

The BIA also noted that Amos could not identify the OPC members that harmed him, nor did he see who set fire to

---

[74] *Id.* at 517.
[75] *Quinteros v. Att'y Gen.*, 945 F.3d 772, 786 (3d Cir. 2019).
[76] AR 9.
[77] AR 527.
[78] AR 9.

his house.  The BIA implies that Amos's inability to identify the persecutors demonstrates his inability to prove government instigation or acquiescence.  The fact that Amos cannot identify his perpetrators cannot, alone, undermine his claim of government involvement or acquiescence.  If that were true, the protections intended under the CAT could be undermined by the mere fact of persecutors wearing masks and hiding their identity.  Even stating such a proposition demonstrates its absurdity.  CAT relief cannot turn on whether purveyors of fear and violence take time to identify themselves.  Even in the most repressive of societies, those who commit atrocities are not likely to leave calling cards behind that reveal their identities.

We realize, of course, that proving government involvement or acquiescence may be more difficult absent proof of the identity of the persecutors.  However, it is not impossible.  In some cases, circumstantial evidence may be sufficient to establish government involvement or acquiescence in acts of persecution or torture, such as evidence that the government was aware of torture and failed to intervene.[79]  Practical difficulties must not be allowed to make proof so impossible that victims of torture (or

---

[79] *See e.g.*, *Myrie*, 855 F.3d at 516-17 (explaining that "[c]ircumstantial evidence may establish acquiescence to targeted acts of violence" and "[c]ircumstantial evidence that public officials are willfully blind may establish acquiescence to future torture"); *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 351 (3d Cir. 2008) (remanding for further consideration of circumstantial evidence that government officials were willfully blind to the petitioner's alleged torture).

persecution) are condemned to suffer its horrendous consequences.

The government concedes that the BIA did not "consider all the evidence of past harm in the record" [80] and asks us to give the BIA the opportunity to consider record evidence of recent incidents of alleged torture. We will remand for reconsideration of Amos's CAT claim under *Myrie*.

**2.**

Amos also argues that "the IJ's failure to conduct an *Abdulai* inquiry fatally impacted the CAT analysis."[81] He asks us to remand to the IJ to conduct a proper corroboration determination. The government did not respond to this argument in its briefing and therefore forfeited any objection.[82]

In *Abdulai v. Ashcroft*, we held that "the BIA may sometimes require otherwise-credible applicants to supply corroborating evidence" to meet their burden of proving

---

[80] Gov't Suppl. Br. 46.
[81] Amos Opening Br. 24.
[82] *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 437 n.11 (3d Cir. 2005) (observing that an appellee who "fail[s] to respond to an appellant's argument in favor of reversal [forfeits] any objections not obvious to the court to specific points urged by the [appellant]" (second alteration in original) (citation omitted)); *see also Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 148 (3d Cir. 2017) (distinguishing between waiver and forfeiture).

entitlement to relief.[83]  *Abdulai* requires an IJ to (1) identify "the facts for which 'it is reasonable to expect corroboration'"; (2) inquire "as to whether the applicant has provided information corroborating the relevant facts; and, if he or she has not"; (3) assess "whether the applicant has adequately explained his or her failure to do so."[84]

The IJ mentioned *Abdulai* without engaging in its inquiry and found that Amos had not established "it is more likely than not that he would be tortured in Nigeria at the instigation of, or with the consent or acquiescence of, a public official" because the "record lacks any history of torture . . . by the government."[85]  It further found that Amos's fears of torture were based on incidents that occurred more than twenty years earlier, thus rendering his fears of torture upon removal speculative.

The BIA affirmed the denial of Amos's CAT claim because the IJ found insufficient record evidence to corroborate Amos's testimony that he was tortured at the direction, or with the acquiescence, of the Nigerian government.  It also failed to conduct any inquiry under *Abdulai*.

---

[83] *Abdulai*, 239 F.3d at 554.

[84] *Id.*

[85] AR 80.  The IJ further noted that Amos could not name the individuals who kidnapped him, beat him, or burned down his apartment.  As we explained, *supra* in II(D)(1), the fact that petitioners cannot identify the names or identities of their persecutors is not sufficient to deny relief from removal.

As noted above, the government conceded the BIA did not consider "more recent incidents described in letters from [Amos's] mother, brother, and a fellow union member."[86] There is no explanation for the failure to consider this evidence. As the BIA reconsiders Amos's CAT claim under *Myrie* on remand, it must also consider whether the evidence Amos raised was corroborative under *Abdulai.*

### E. Eligibility for Waiver of Inadmissibility Under 8 U.S.C. § 1182(h).

Finally, Amos argues that the IJ failed to advise him of his "prima facie eligibility for a waiver of inadmissibility under 8 U.S.C. § 1182(h)(1)(B)."[87]

> Under § 1182(h), the Attorney General in his[/her] discretion may waive [a noncitizen's] inadmissibility for a crime of moral turpitude if the [noncitizen] is a spouse, parent, or child of a United States citizen . . . and can show that denial of admission would cause extreme hardship to the citizen[.][88]

---

[86] Gov't Suppl. Br. 46.

[87] Amos Opening Br. 54.

[88] *De Leon-Reynoso v. Ashcroft*, 293 F.3d 633, 637 (3d Cir. 2002); *see also* 8 C.F.R. § 1240.1(a)(1)(ii) ("In any removal proceeding pursuant to section 240 of the [INA—which governs removal proceedings], the immigration judge shall have the authority to . . . determine applications under [8 C.F.R. § 212(h)—which governs waiver of inadmissibility]").

A noncitizen is apparently eligible for relief under section 1182(h)(1)(B) when s/he meets the threshold requirement by demonstrating that s/he is the "spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence."[89] Failure to "inform [a petitioner] of his or her apparent eligibility" for relief is a regulatory violation.[90] Amos satisfies section 1182(h)(1)(B)'s threshold requirement because the record shows that he is the father of four United States-citizen children. Thus, the IJ was obligated to inform him of such relief.[91]

Amos has further shown that the IJ's failure to inform him of his apparent eligibility had the potential to affect the outcome of the proceeding.[92] The BIA concluded that Amos was not prejudiced in part because a waiver of inadmissibility

---

[89] *United States v. Muro-Inclan*, 249 F.3d 1180, 1184 (9th Cir. 2001).

[90] *See* 8 C.F.R. § 1240.11(a)(2) ("The [IJ] shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing[.]").

[91] *See Moran-Enriquez v. I.N.S.*, 884 F.2d 420, 422 (9th Cir. 1989); *Hassan v. I.N.S.*, 927 F.2d 465, 467 (9th Cir. 1991) (finding that petitioner "clearly meets the threshold requirement" of 8 U.S.C. § 1182(h)(1)(B) "as both the spouse and the parent of American citizens").

[92] *See Serrano-Alberto*, 859 F.3d at 213; *Aquino v. Att'y Gen.*, 53 F.4th 761, 766 (3d Cir. 2022) (applying *Serrano-Alberto*'s prejudice test to violations of immigration regulations that did not protect fundamental rights).

under section 1182(h)(1)(B) has more stringent requirements than those for cancellation of removal under 8 U.S.C. § 1229b(b)(1)(D). But the BIA got that backwards.

A waiver of inadmissibility under section 1182(h)(1)(B) requires "extreme hardship"[93] to qualifying family members, while cancellation of removal under section 1229b(b)(1)(D) requires "exceptional and extremely unusual hardship"[94] to qualifying family members. The latter is "plainly" a higher bar than the former.[95] So the IJ's determination that Amos was ineligible for cancellation of removal did not rule out his eligibility for a waiver of inadmissibility. And neither we nor the BIA can rule out that the IJ would have exercised his discretion favorably with respect to such relief where Amos's U.S. citizen children have a variety of mental and physical disabilities and diseases. Accordingly, Amos has shown prejudice, and we will remand to the agency for further proceedings regarding a waiver of inadmissibility under section 1182(h)(1)(B).

### III.    Conclusion

For these reasons, we will grant Amos's petition in part and remand to the BIA for reconsideration of (1) the particularly serious crime determination; (2) CAT relief; and (3) waiver of inadmissibility. We deny Amos's petition to review his due process claim.

---

[93] *See* 8 U.S.C. § 1182(h)(1)(B).
[94] *See* 8 U.S.C. § 1229b(b)(1)(D).
[95] *Wilkinson v. Att'y Gen.*, 131 F.4th 134, 143 (3d Cir. 2025)*; Pareja v. Att'y Gen.*, 615 F.3d 180, 191–93 (3d Cir. 2010).

30